*This opinion is subject to revision before
publication in the Pacific Reporter*

**2015 UT 8**

IN THE

# SUPREME COURT OF THE STATE OF UTAH

J. FRANK BURDICK; JIMMY V. HENRIE; GRANT B. HOWELL;
ELLA DEAN HUNTER; TERRY L. JORDAN; RICHARD MANUS;
TERESA MANUS; MICHAEL MARQUEZ; TERI MARQUEZ;
LURENE SWINBURNE, personal representative,
for and on behalf of the estate of
ROBERT D. SWINBURNE; and WYLMA TEMPLES,
*Appellants*,

*v.*

HORNER TOWNSEND & KENT, INC.;
JEFFREY C. CAMPBELL; FIVE STAR FINANCIAL GROUP,
*Appellees*.

No. 20110479
Filed January 23, 2015

Seventh Juvenile, Price Dep't
The Honorable Douglas B. Thomas
No. 060700588

Attorneys:

Fred R. Silvester, Spencer C. Siebers, Salt Lake City,
for appellants

John P. Harrington, Sherilyn A. Olsen, Salt Lake City,
for appellees

ASSOCIATE CHIEF JUSTICE NEHRING authored the opinion
of the Court, in which CHIEF JUSTICE DURRANT, JUSTICE DURHAM,
JUSTICE PARRISH, and JUSTICE LEE joined.

ASSOCIATE CHIEF JUSTICE NEHRING, opinion of the Court:

## INTRODUCTION

¶ 1 Disappointed investors filed suit against their
investment agent, Jeffrey Campbell, and his former employer,

Hornor, Townsend & Kent, Inc. (HTK), alleging that Mr. Campbell and HTK were liable for losses sustained in an investment scam. Mr. Campbell pleaded guilty to the sale of unregistered securities related to the investment scam and was ordered to pay restitution. The district court granted summary judgment in favor of HTK on plaintiffs' claims of securities violations, negligent misrepresentation, and negligent training and supervision. The district court also granted summary judgment in favor of HTK regarding a release signed by one investor. Plaintiffs appeal the grant of summary judgment on the above issues. The district court also denied plaintiffs' motion for reconsideration where they raised claims for negligence, control-person liability, and material aid. Additionally, plaintiffs appeal the rejection of reasonable attorney fees with respect to the resolution of the claims against Mr. Campbell. We affirm in part and reverse and remand in part.

## BACKGROUND

### I. FACTUAL BACKGROUND

¶ 2     HTK is a broker-dealer licensed to sell securities in the state of Utah. HTK licenses registered representatives to sell securities and other investment products. In July 2001, Mr. Campbell became a registered representative of HTK. Before becoming a registered representative of HTK, Mr. Campbell created a "doing business as" entity named Five Star Financial Group (FSFG), which, according to Mr. Campbell, was for marketing purposes. Mr. Campbell intended FSFG to allow him to change his broker-dealer affiliation without having to change his business name in order to maintain name recognition. FSFG never became a separate legal entity, but was a marketing name for Mr. Campbell. FSFG maintained an office at 70 W. Main Street, Price, Utah. In addition to Mr. Campbell, FSFG consisted of Frank Wheeler, Mary Alger, and Fred Davis. Mr. Davis, Mr. Wheeler, and Ms. Alger were also registered representatives of HTK.

¶ 3     In mid-2002, Mr. Campbell was approached by Michael Fitzgerald about selling investments in Beverly Hills Development Corporation (BHDC). BHDC sold investments in the form of promissory notes, supposedly backed by real estate, which would be developed and sold to repay investors at a rate of return of 12 percent per annum. Mr. Campbell inquired whether

the BHDC notes were securities, to which Mr. Fitzgerald responded that the promissory notes were not securities. Following his meetings with Mr. Fitzgerald, Mr. Campbell called his supervisors at HTK, informed them he was investigating the possibility of selling BHDC notes, and inquired how that would affect his current relationship with HTK. Mr. Campbell met with one of his supervisors, Monty Andrus, in person. Mr. Andrus was a registered principal of HTK operating under the name Cambridge Financial whose primary responsibilities included hiring agents after initial approval by HTK, conducting yearly compliance interviews and site visits, and supervising registered agents within his region. Mr. Andrus's region included FSFG and its registered agents. At their meeting, Mr. Campbell informed Mr. Andrus that he was surrendering his securities license in order to sell BHDC notes and that the surrender was to avoid "a possible conflict with the sale of [BHDC] promissory notes." Mr. Campbell submitted a resignation letter on October 17, 2002, requesting inactivation of his securities license, while maintaining his ability to sell insurance investments through Penn Mutual Life Insurance (Penn Mutual). Mr. Campbell then began selling BHDC notes and was paid $10,000 per month.

¶ 4     Mr. Campbell sold BHDC notes from his office at FSFG. Mr. Campbell informed the other agents in his office that he had inactivated his securities license in order to sell BHDC notes. Around the time Mr. Campbell inactivated his license, Mr. Andrus told Mr. Wheeler, Ms. Alger, and Mr. Davis they should distance themselves from Mr. Campbell and "cut a clear line so that clients would not perceive that [they] were involved" in the sale of BHDC notes. Neither Mr. Andrus nor Terry Boulter, the compliance officer working with Mr. Andrus at Cambridge Financial, detailed any other specific steps for the remaining HTK registered representatives to take in separating themselves from Mr. Campbell. The other agents attempted to distance themselves by refraining from endorsing BHDC notes in any way or meeting clients together with Mr. Campbell. The remaining HTK agents continued to operate out of the same office building as Mr. Campbell and continued to use the FSFG name through 2003. There was no change in the office configuration, phone or fax numbers, or office signage following the termination of Mr. Campbell's relationship with HTK. Mr. Campbell continued to share computer systems, including access to all customer data,

with the other agents in the FSFG office, all of whom were registered representatives of HTK. Ms. Alger continued to use the same shared computer system to prepare paperwork and maintain customer files for Mr. Campbell. At some point in 2003, Mr. Wheeler, Ms. Alger, and Mr. Davis discontinued operating under the FSFG name and began using the Cambridge Financial name.

¶ 5    From October 2002 to September 2003, Mr. Campbell solicited investments from and sold BHDC notes to plaintiffs. Plaintiffs began their investing relationships with Mr. Campbell at different times. Before his affiliation with HTK, Mr. Campbell had been affiliated with another broker-dealer, and during that time sold various investment products to plaintiffs Jimmie Henrie, Robert Swinburne, and Ella Dean Hunter. Mr. Henrie, Mr. Swinburne, and Ms. Hunter did not purchase any HTK-approved investment products from Mr. Campbell while he was affiliated with HTK as a registered representative. During his time as an HTK registered representative, Mr. Campbell sold various HTK-approved investment products to plaintiffs Frank Burdick, Wylma Temples, and Richard and Teresa Manus. The remaining plaintiffs—Terry Jordan, Loralyn Thayn, and Michael and Teri Marquez—began their investment relationship with Mr. Campbell only after his resignation from HTK, and they purchased only BHDC notes from Mr. Campbell.

¶ 6    Plaintiffs received monthly statements from BHDC, listing the Price, Utah, address of FSFG through January 2004. In February 2004, the BHDC monthly statements began listing the name Michael Fitzgerald and a different address in Alpine, Utah. In March, payments began to slow, and plaintiffs became worried about their investments. On April 1, 2004, Mr. Campbell met with the plaintiffs and informed them that Mr. Fitzgerald's brother, also involved in the BHDC notes, had left the country with their money, which precipitated the litigation in this case.

## II. PROCEDURAL BACKGROUND

¶ 7    Plaintiffs originally filed suit against HTK, FSFG, Mr. Campbell, and Mr. Wheeler on March 3, 2006. HTK filed a timely answer to plaintiffs' complaint and a cross-claim against Mr. Campbell and Mr. Wheeler, alleging deceptive trade practices, breach of contract against Mr. Wheeler, and indemnification against Mr. Wheeler. Following several rounds

of discovery, plaintiffs were granted leave to file a Third Amended Complaint. In the Third Amended Complaint, plaintiffs alleged four securities violations, fraud, fraudulent concealment, negligent misrepresentation, breach of fiduciary duty, civil conspiracy, and negligent training and supervision. The four securities violations alleged were for material misrepresentations and omissions, the sale of unregistered securities, the sale of unsuitable securities, and the sale of securities by an unlicensed broker-dealer. HTK filed a timely answer to the Third Amended Complaint. During discovery, plaintiffs stipulated to and the court ordered dismissal of the claims for civil conspiracy, fraud, fraudulent concealment, breach of fiduciary duty, and the sale of securities by an unlicensed agent or broker-dealer. While discovery was continuing on plaintiffs' claims, Mr. Campbell pleaded no contest to one count of selling unregistered securities, was granted a plea in abeyance, and was ordered to pay restitution.

¶ 8     Following additional discovery, the district court granted HTK's motion for summary judgment against plaintiff Grant Howell on January 11, 2008, based on a release (Release) between Mr. Howell and Penn Mutual Life Insurance, the parent company of HTK. The district court granted summary judgment after ruling the Release was clear and unambiguous. Additional discovery was allowed to determine if the Release was procured by fraud or mistake. Mr. Howell filed a Motion to Set Aside Summary Judgment, which was denied, and the district court granted HTK's Second Motion for Summary Judgment after deciding that the Release was not procured by fraud or mistake.

¶ 9     Mr. Wheeler sought summary judgment against all plaintiffs. Plaintiffs did not oppose Mr. Wheeler's motion for summary judgment; thus, the district court entered summary judgment in favor of Mr. Wheeler and dismissed plaintiffs' claims against him with prejudice.

¶ 10     In April 2009, HTK sought summary judgment against the remaining plaintiffs.[1]  In June 2009, the district court entered

---

[1] The remaining plaintiffs consisted of Ms. Hunter, Mr. Henrie, Mr. Burdick, the Manuses, Mr. Jordan, the Marquezes, Ms. Temples, Mr. Swinburne, and Ms. Thayn.

summary judgment for HTK against the remaining plaintiffs. The district court concluded that plaintiffs failed to produce sufficient evidence to create a genuine issue of material fact as to whether Mr. Campbell acted with the apparent authority of HTK when he sold the BHDC notes. The district court divided plaintiffs into two categories. Category One Plaintiffs were those plaintiffs who purchased HTK-approved products through Mr. Campbell while he was a registered representative of HTK. Category One Plaintiffs consisted of Mr. Burdick, Ms. Temples, and the Manuses. The district court concluded that Category One Plaintiffs could not establish the third element of apparent authority—that they relied on the involvement of HTK when they invested in BHDC. Category Two Plaintiffs were plaintiffs who purchased products from Mr. Campbell while he was not a registered representative of HTK. Category Two Plaintiffs consisted of Mr. Henrie, Ms. Hunter, Mr. Jordan, Mr. Swinburne, Ms. Thayn,[2] and the Marquezes. The district court concluded that Category Two Plaintiffs could not establish any of the elements of apparent authority. The district court also ruled that plaintiffs' claim for failure to supervise or negligent supervision failed as a matter of law, in that HTK did not have a duty to supervise Mr. Campbell. Finally, the district court concluded that HTK properly pleaded the statute of limitations as an affirmative defense against the state security violations claims. In reviewing the statute of limitations defense, the district court found that the undisputed material facts of the case established that the Marquezes failed to file their state security claims within the two-year statute of limitations.

¶ 11   Following the grant of summary judgment in favor of HTK, plaintiffs pursued their claim against Mr. Campbell and his dba FSFG, alleging that he sold unregistered securities in a reckless manner. This claim was tried to a jury in September 2010. The jury found that Mr. Campbell had sold BHDC notes recklessly and a judgment was entered against Mr. Campbell individually with damages awarded for the amounts invested, with 12 percent interest, and attorney fees, all of which were

---

[2] Ms. Thayn did not appeal in this case.

initially trebled under Utah Code section 61-1-22(2).[3] Following the trebling of this amount, other allowable damages under the statute were added to the total and the amounts Mr. Campbell had already repaid to investors were subtracted.

¶ 12 After the jury trial concluded, the district court reviewed the grant of summary judgment in favor of HTK against the Marquezes based on statute of limitation grounds. The district court noted that since the grant of summary judgment, the United States Supreme Court had decided *Merck & Co. v. Reynolds*, addressing issues of the statute of limitations regarding securities claims.[4] The district court had not yet entered the final order in the case and was concerned that the *Merck & Co.* opinion could impact the grant of summary judgment against the Marquezes. The court asked the parties to brief the issue.

¶ 13 Rather than addressing only the statute of limitations claims regarding the Marquezes, plaintiffs filed a Motion for Entry of Judgment and a Motion for Reconsideration on November 9, 2010, seeking a review of all claims previously granted summary judgment and raising new claims for the first time. HTK objected to the Motion for Entry of Judgment and Proposed Judgment, objected to the Motion for Reconsideration, and filed a Motion to Strike the declarations and certain appendix exhibits submitted with the Motion for Reconsideration and accompanying Memorandum. Plaintiffs filed appropriate replies, including a Declaration in Support of Attorneys' Fees and a Memorandum in Opposition of HTK's Motion to Strike.

¶ 14 The district court first addressed plaintiffs' Motion for Entry of a Final Judgment. The district court dismissed plaintiffs' claims against HTK on summary judgment and denied the motion to set aside summary judgment with regard to Mr. Howell. First, the district court found that attorney fees were limited to the

___

[3] The trebling of damages was later amended to include only the consideration paid for the security.

[4] 559 U.S. 633 (2010).

prosecution of claims against Mr. Campbell[5] and not HTK, and that the Affidavit of Attorneys' Fees lacked sufficient detail and failed to segregate the work performed with respect to claims against Mr. Campbell as opposed to HTK, making it "impossible" to permit a determination of reasonable attorney fees. The district court determined the one-third contingency fee agreement between plaintiffs and their counsel was insufficient to establish reasonable attorney fees and thus denied attorney fees as part of the proposed judgment. Second, the district court determined that trebling of damages was permitted under Utah Code section 61-1-22(2). However, the district court determined the only amount to be trebled was the consideration paid for the BHDC notes, with interest and fees added, and funds already received subtracted. The district court granted damages based on that calculation.

¶ 15    The district court also addressed HTK's Motion to Strike. The district court found that the declarations of plaintiffs, a data summary from the Central Registration Depository (CRD) pertaining to Mr. Campbell, a notice (Notice 01-79D) from the National Association of Securities Dealers (NASD), and the Financial Industry Regulatory Authority (FINRA) arbitration resolutions were all available at the time of the summary judgment proceedings for presentation to the court. The district court found no cognizable justification for why the attachments were not submitted prior to the grant of summary judgment to HTK. Therefore, the court granted HTK's Motion to Strike the attachments from the record.

¶ 16    Finally, the district court addressed plaintiffs' Motion for Reconsideration. After briefing and argument on the impact of *Merck & Co.*, the district court reconsidered its Order and modified it to read that there were genuine issues of material fact regarding the statute of limitations with regard to the Marquezes' claims. The district court reviewed plaintiffs' claims that HTK was liable, as a principal, for Mr. Campbell's actions under an agency theory on the basis of apparent authority. The district

---

[5] Claims against FSFG were pursued with the individual claims against Mr. Campbell because FSFG was merely a dba of Mr. Campbell and never became a separate legal entity.

court reaffirmed its legal and factual findings regarding apparent authority, and accordingly denied the plaintiffs' Motion for Reconsideration on the claims based on principal–agent liability. The district court next ruled that plaintiffs' evidence representing HTK as a control person for statutory liability was stricken as untimely and was not considered; thus, there was no new evidence to view and the district court denied plaintiffs' Motion for Reconsideration with respect to control-person liability theory. The district court then reviewed the claim that HTK was liable for materially aiding Mr. Campbell in the sale of unregistered securities. The court reaffirmed its findings and conclusions and denied the Motion for Reconsideration regarding HTK's involvement in the material aid in the sale of unregistered securities. The district court also reaffirmed its findings and conclusions regarding whether HTK acted negligently and denied the Motion for Reconsideration on the issue of whether HTK acted negligently. Plaintiffs timely appealed. We have jurisdiction under Utah Code section 78A-3-102(3)(j).

## STANDARDS OF REVIEW

¶ 17    Plaintiffs contend that the district court erred when it granted summary judgment in favor of HTK on the issues of apparent authority, negligence, material aid, control-person liability, and Mr. Howell's release. "We review the district court's decision to grant summary judgment for correctness, granting no deference to the district court."[6]

¶ 18    Plaintiffs also appeal the district court's rejection of plaintiffs' request for attorney fees. "[T]he district court has broad discretion in determining what constitutes a reasonable fee, and we will consider that determination against an abuse-of-discretion standard."[7]

---

[6] *Commercial Real Estate Inv. v. Comcast of Utah II, Inc.*, 2012 UT 49, ¶ 14, 285 P.3d 1193 (internal quotation marks omitted).

[7] *Softsolutions, Inc. v. Brigham Young Univ.*, 2000 UT 46, ¶ 12, 1 P.3d 1095 (internal quotation marks omitted).

## ANALYSIS

¶ 19   Plaintiffs bring six issues on appeal.  First, plaintiffs argue the district court erred when it determined there were no genuine issues of material fact to support claims for securities violations and negligent misrepresentation based on agency liability under a theory of apparent authority.  Second, plaintiffs argue that the district court erred when it granted summary judgment for HTK on plaintiffs' negligence claim.   Third, plaintiffs argue that the district court erred when it struck evidence and refused to consider plaintiffs' claim premised on the theory of control-person liability.  Fourth, plaintiffs argue that the district court erred when it granted summary judgment for HTK on the theory that HTK materially aided in the sale of unregistered securities.  Fifth, plaintiffs argue that the district court erred when it ruled the Release between Grant Howell and Penn Mutual was clear and unambiguous in releasing all claims against HTK.  Finally, plaintiffs argue the district court abused its discretion when it rejected the contingent attorney fees without an appropriate evaluation of the contingent fee agreement.   We address each claim in turn.

## I.  THE DISTRICT COURT DID NOT ERR
## WHEN IT GRANTED SUMMARY JUDGMENT
## ON PLAINTIFFS' SECURITIES AND NEGLIGENT
## MISREPRESENTATION CLAIMS

¶ 20   Plaintiffs allege that HTK violated various state security laws and negligently misrepresented securities in connection with the sale of the BHDC notes.  Plaintiffs' theory behind HTK's liability is that Mr. Campbell was acting as an agent of HTK, on the basis of apparent authority, when he sold the BHDC notes.[8] The district court granted summary judgment for HTK on these claims, finding that there were no genuine issues of material fact and that no plaintiff could establish the elements required to prove HTK had cloaked Mr. Campbell with apparent authority. Plaintiffs Mr. Burdick, Ms. Temples, Ms. Hunter, Mr. Jordan, and the Marquezes appeal the district court's ruling, arguing there

---

[8] The parties have stipulated that Mr. Campbell did not act with actual authority when he sold the BHDC notes.

was sufficient evidence on the record to overcome summary judgment.[9]

¶ 21 We begin by noting that due to the agent-brokerage licensing structure for the sale of securities, agency liability on the basis of apparent authority is no stranger to securities law.[10] Indeed, a licensed securities agent, like any agent, may simultaneously be cloaked with both actual and apparent authority, the distinction being that the former relates to a principal's manifestations to the agent, and the latter relates to a principal's manifestations to a third party.[11] "Apparent authority is the power held by an agent . . . to affect a principal's legal relations with third parties when a third party reasonably believes the actor has authority to act on behalf of the principal and that belief is traceable to the principal's manifestations."[12] We recently reiterated this longstanding rule:

> [W]here a principal has, by his voluntary act, placed an agent in such a situation that a person of ordinary prudence, conversant with business usages and the nature of the particular business, is justified in presuming that such agent has authority to perform, on behalf of his principal, a particular act, such particular act having been performed, the principal is estopped as against such innocent third

---

[9] Plaintiffs Mr. and Mrs. Manus, Mr. Henrie, and Ms. Swinburne did not appeal this ruling.

[10] In a wide variety of areas, the federal courts have imposed liability on principals for the misdeeds of agents acting with apparent authority. *See, e.g., Am. Soc'y of Mech. Eng'rs, Inc. v. Hydrolevel Corp.*, 456 U.S. 556, 565–66 (1982).

[11] RESTATEMENT (SECOND) OF AGENCY § 124A cmt. a (1958). ("Authority and apparent authority . . . may exist concurrently or there may be one and not the other.").

[12] RESTATEMENT (THIRD) OF AGENCY § 2.03 (2006).

person, from denying the agent's authority to perform it.[13]

¶ 22 "The doctrine of apparent authority has its roots in equitable estoppel. [I]t is founded on the idea that where one of two persons must suffer from the wrong of a third[,] the loss should fall on that one whose conduct created the circumstances which made the loss possible."[14] The authority of an agent is not "'apparent' merely because it looks so to the person with whom he deals," but rather "[i]t is the *principal* who must cause third parties to believe that the agent is clothed with apparent authority."[15] A "belief that results solely from the statements or other conduct of the agent, unsupported by any manifestations traceable to the principal, does not create apparent authority," and "[a]n agent's success in misleading the third party as to the existence of actual authority does not in itself make the principal accountable."[16]

¶ 23 We articulated the three-part test for apparent authority in *Luddington v. Bodenvest, Ltd.*:

> (1) that the principal has manifested his [or her] consent to the exercise of such authority or has knowingly permitted the agent to assume the exercise of such authority;
>
> (2) that the third person knew of the facts and, acting in good faith, had reason to believe, and did actually believe, that the agent possessed such authority; and
>
> (3) that the third person, relying on such appearance of authority, has changed his [or her]

---

[13] *Grazer v. Jones*, 2012 UT 58, ¶ 11, 289 P.3d 437 (alteration in original).

[14] *Luddington v. Bodenvest Ltd.*, 855 P.2d 204, 209 (Utah 1993) (first alteration in original) (citation omitted) (internal quotation marks omitted).

[15] *City Elec. v. Dean Evans Chrysler-Plymouth*, 672 P.2d 89, 90 (Utah 1983) (emphasis added).

[16] RESTATEMENT (THIRD) OF AGENCY § 2.03 cmt. c (2006).

position and will be injured or suffer loss if the act done or transaction executed by the agent does not bind the principal.[17]

¶ 24　The district court concluded that Ms. Hunter and Mr. Jordan failed to demonstrate issues of material fact as to all three elements; that Mr. Burdick and Ms. Temples failed to establish element three—reliance upon the manifestation of authority; and that the Marquezes failed to demonstrate elements one and two—manifestation of authority by HTK or that they believed or had reason to believe that Mr. Campbell possessed such authority.

¶ 25　For clarity, we structure our analysis according to the category of plaintiffs. We agree with the district court that the Category One Plaintiffs who appealed—Mr. Burdick and Ms. Temples—failed to demonstrate issues of material fact as to the element of reliance. We also agree that the Category Two Plaintiffs—Ms. Hunter, Mr. Jordan, and the Marquezes—failed to demonstrate issues of material fact as to a manifestation of authority by HTK. Accordingly, we affirm the grant of summary judgment for HTK on the issues of apparent authority.[18]

### A. Category One Plaintiffs Mr. Burdick and Ms. Temples Fail to Demonstrate Reliance

¶ 26　The district court concluded that Mr. Burdick's and Ms. Temples's evidence failed to demonstrate a genuine issue of material fact with respect to the third element of the apparent authority test: whether they relied on the appearance of authority, changed their position, and would be injured or suffer loss if the act done by Mr. Campbell does not bind HTK.

¶ 27　We first note that the issue of reliance as an element of apparent authority seems to be a matter of some confusion and

---

[17] 855 P.2d at 209 (alterations in original) (quoting 3 AM. JUR. 2D *Agency* § 80 (1986)).

[18] Because each plaintiff failed to establish at least one required element for apparent authority, we do not decide whether they may have met the other elements.

disagreement among courts and scholars.[19]   For example, the Restatement (Third) of Agency takes the position that apparent authority is a separate doctrine from equitable estoppel—the latter requiring a showing of reliance while the former does not.[20] In contrast, American Jurisprudence uses the terms "apparent authority" and "equitable estoppel" interchangeably, and requires reliance as an element of both.[21]   Plaintiffs appear to argue for a position akin to the Restatement, contending that the district court

---

[19] *Compare Jones v. HealthSouth Treasure Valley Hosp.*, 206 P.3d 473, 480–81 (Idaho 2009) ("[A] plaintiff is only required to prove reasonable belief, rather than justifiable reliance, to satisfy a claim of apparent authority."), *with Christian Methodist Episcopal Church v. S & S Constr. Co.*, 615 So. 2d 568, 573 (Miss. 1993) (requiring a "detrimental change in position as a result of reliance"), *and Billops v. Magness Constr. Co.*, 391 A.2d 196, 198 (Del. 1978) ("[A] litigant must show reliance on the indicia of authority originated by the principal"). *See generally* Dane Getz, Comment, *The Doctrine of Apparent Authority in Illinois Medical Malpractice Cases: An Argument for Its Application*, 18 S. ILL. U. L.J. 195 (1993) (discussing confusion and inconsistency surrounding reliance and the doctrine of apparent authority).

[20] RESTATEMENT (THIRD) OF AGENCY § 2.03 cmt. e (2006) ("To establish that an agent acted with apparent authority, it is not necessary for the plaintiff to establish that the principal's manifestation induced the plaintiff to make a detrimental change in position, in contrast to the showing required by the estoppel doctrines . . . .").

[21] 3 AM. JUR. 2D *Agency* § 81 (1986) ("Although the general statements of the doctrine of apparent authority do not include all the elements of . . . equitable estoppel, . . . there is no practical difference in effect between them . . . ." (footnotes omitted)); *see also Baptist Mem'l Hosp. Sys. v. Sampson*, 969 S.W.2d 945, 947 n.2 (Tex. 1998) ("Many courts use the terms ostensible agency, apparent agency, apparent authority, and agency by estoppel interchangeably."); *Great Am. Ins. Co. v. Gen. Builders, Inc.*, 934 P.2d 257, 261 (Nev. 1997) ("Apparent authority is, in essence, an application of equitable estoppel, of which reasonable reliance is a necessary element.").

erroneously required that "reliance must be on a specific principal."[22] However, Utah has taken the position that a plaintiff must establish that he relied on the manifestation of authority—that is, that he changed his position as a result of the appearance of authority.[23] This is because "authority by holding out is of no importance until a third party relies thereon."[24] We find no reason to depart from that position.

¶ 28 With this in mind, we turn to whether there is sufficient information in the record to demonstrate a genuine issue of material fact on whether Mr. Burdick and Ms. Temples reasonably relied on legally sufficient manifestations of Mr. Campbell's authority to act for HTK, viewing all evidence in favor of the plaintiffs, the nonmoving parties on summary judgment.

¶ 29 Mr. Burdick first met with Mr. Campbell in 2001, shortly after Mr. Burdick's retirement. In his deposition testimony, Mr. Burdick stated that Mr. Campbell represented that he was affiliated with HTK, and this representation was made when Mr. Burdick chose to roll his union pension into an annuity. Mr. Burdick also testified that he understood Mr. Campbell to be a licensed professional and, based on documents he signed when rolling over his pension, Mr. Burdick knew that HTK was involved in licensing Mr. Campbell. After making the investment in the annuity, Mr. Burdick continued to meet with Mr. Campbell every six to eight weeks for two years. When Mr. Campbell offered Mr. Burdick the BHDC notes, Mr. Burdick was under the impression that this was "just another investment" option offered. After the sale of BHDC notes, Mr. Burdick continued to meet about his investments with Mr. Campbell. At no point during these meetings was Mr. Burdick notified that Mr. Campbell was no longer working with HTK or that Mr. Burdick's HTK investment products had been reassigned to a different agent. Mr. Burdick also testified that he assumed that during his

_____

[22] Plaintiffs contend that they nonetheless satisfied the reliance element under "either theory."

[23] *Luddington*, 855 P.2d at 209.

[24] *Schlick v. Berg*, 286 N.W. 356, 358 (Minn. 1939).

continued meetings "things were the same as they were" when he first made investments with Mr. Campbell.

¶ 30 Ms. Temples first met with Mr. Campbell when Mr. Wheeler introduced them in fall 2001. Ms. Temples was looking to "check out doing something with some money [she] had inherited." Ms. Temples testified she first became aware of HTK at that time and understood it was a broker. Ms. Temples also testified that she believed Mr. Campbell worked for HTK, and that HTK owned FSFG. After meeting with Mr. Campbell, Ms. Temples agreed to place the inheritance in an annuity. Ms. Temples continued to meet with Mr. Campbell. Ms. Temples testified that she understood Mr. Campbell was acting on behalf of HTK when he sold her the BHDC notes, and furthermore, that if there was a change in Mr. Campbell's affiliation, "[h]e had never told me he did anything different, so I assumed it was [HTK]." Furthermore, Ms. Temples asked Mr. Wheeler—an HTK agent who was in the same office as Mr. Campbell—his opinion about BHDC. In his office, Mr. Wheeler responded to Ms. Temples that he thought it was a "good thing," that "customers were loving it," and that if he "had any extra money he would invest in it too."

¶ 31 Neither Mr. Burdick nor Ms. Temples received notification from Mr. Campbell or HTK that Mr. Campbell was no longer an authorized agent of HTK. The Registered Representative's Contract between Mr. Campbell and HTK required a representative to "immediately remove any signs and terminated [sic] all advertisements, including telephone numbers if possible, which may indicate an association with HTK" and "immediately notify all clients in writing that Representative is no longer associated with HTAK [sic], sending a copy of such notice to HTK." Mr. Burdick and Ms. Temples both testified that they received no notice, either from Mr. Campbell or HTK. Mr. Campbell testified that not only did he fail to send a letter notifying clients of his affiliation change, but he continued to monitor his HTK clients' accounts. Jay Baker, a senior compliance analyst with HTK at the time, testified that HTK was aware of Mr. Campbell's resignation, Mr. Campbell's clients were not transferred to another broker-dealer, and Mr. Campbell's clients who purchased HTK products from him were still customers of HTK. Mr. Baker also testified that "[i]t would not be [HTK's] normal practice to . . . write out to their client base" to inform

them of any affiliation change. Furthermore, the remaining HTK agents sharing the office with Mr. Campbell continued using the same office space (with no change in the configuration), phone and fax numbers, and office signage as Mr. Campbell. Mr. Campbell and the HTK agents also shared a computer system and access to all customer files. Finally, when Mr. Burdick received a statement regarding the BHDC notes reflecting an address change, he phoned Mr. Campbell and was told there "wasn't a problem, it was just some kind of legal issue and they had to do it."

¶ 32 The district court found that Mr. Burdick testified that "he understood [Mr.] Campbell was somehow affiliated with HTK . . . and he assumed HTK was somehow involved in the sale of BHDC because HTK had been involved with Mr. Campbell two years prior to investing in BHDC." However, the court concluded that "[a]t no time did Mr. Burdick state that he invested in BHDC because of HTK" and "presented no evidence that he invested in BHDC because of HTK's involvement or because he made the assumption about HTK's involvement." As to Ms. Temples, the district court found "[a]t no time did Mrs. Temples testify that she invested in BHDC because of HTK's alleged involvement. There is no evidence that she would not have invested anyway and HTK, therefore, cannot be considered a cause of her investment." We agree with the district court's conclusions. That Mr. Burdick or Ms. Temples believed in a continued relationship between Mr. Campbell and HTK and were not informed of his termination may go to the *reasonableness* of reliance on his apparent authority, but it does not establish reliance in the first instance. We find nothing in the record demonstrating that either Mr. Burdick or Ms. Temples changed his or her position—that is, that they invested in the BHDC notes—because they believed HTK was the principal behind those investments. Absent this showing, HTK cannot be held liable for the acts of an unauthorized agent.

¶ 33 Plaintiffs also argue that they did provide sufficient evidence regarding reliance because on November 10, 2010—nearly seventeen months after the district court's grant of summary judgment—plaintiffs filed a motion for reconsideration along with declarations asserting that they believed Mr. Campbell

represented HTK when he sold the BHDC notes and that they relied on HTK when they purchased the notes.[25]  They claim that the district court erred when it refused to consider plaintiffs' declarations as untimely.  We disagree.

¶ 34  We first reiterate that "postjudgment motions to reconsider are not recognized anywhere in either the Utah Rules of Appellate Procedure or the Utah Rules of Civil Procedure."[26]  Therefore, "trial courts are under no obligation to consider motions for reconsideration" and "any decision to address or not to address the merits of such a motion is highly discretionary."[27]  We conclude that the district court did not abuse its discretion when it declined to consider the additional evidence.  Plaintiffs claim that the district court should have considered their new evidence because the court had "applied a different rule of law" and "the parties had not had an opportunity to develop the record with an eye toward the newly articulated rule."  This argument is in error because, as discussed above, the element of reliance has long-been required in Utah.  Thus, in its ruling, the district court did not articulate a new rule of law.  Moreover, plaintiffs did not allege any reason why they could not present this evidence earlier.  Instead, it appears that they simply neglected to provide

---

[25] In his declaration, Mr. Burdick stated, "I relied on HTK, its investment advice, and its recommendation, when I invested in BHDC."  Similarly, Ms. Temples declared, "I relied on HTK's approval of BHDC in deciding to invest in BHDC. . . .  I would not have invested in BHDC had I known Mr. Cambpell no longer worked for HTK."

[26] *Gillett v. Price*, 2006 UT 24, ¶ 6, 135 P.3d 861; *id.* ¶ 8 ("Hereafter, when a party seeks relief from a judgment, it must turn to the rules to determine whether relief exists, and if so, direct the court to the specific relief available.  Parties can no longer leave this task to the court by filing so-called motions to reconsider and relying upon district courts to construe the motions within the rules."); *accord Ron Shepherd Ins., Inc. v. Shields,* 882 P.2d 650, 653 n.4 (Utah 1994) ("[T]his court has consistently held that our rules of civil procedure do not provide for a motion for reconsideration of a trial court's order or judgment . . . .").

[27] *Tschaggeny v. Milbank Ins. Co.,* 2007 UT 37, ¶ 15, 163 P.3d 615.

the declarations of reliance during the summary judgment proceeding. We find no basis to conclude that the court abused its broad discretion when it refused to hear evidence presented, for the first time, nearly seventeen months after summary judgment was granted. We therefore affirm the district court's grant of summary judgment in favor of HTK for Mr. Burdick's and Ms. Temples's claims based on apparent authority.

*B. Category Two Plaintiffs Ms. Hunter, Mr. Jordan,*
*and the Marquezes Fail to Show a Manifestation*
*of Authority by HTK*

¶ 35 The district court ruled that all three elements of apparent authority were at issue with the Category Two Plaintiffs—those plaintiffs who first invested with Mr. Campbell when he was no longer a licensed representative of HTK. As to the first element of the *Luddington* test, we reiterate that "the principal . . . must cause third parties to believe that the agent is clothed with apparent authority," and that the authority of an agent is not "'apparent' merely because it looks so to the person with whom he deals."[28]

¶ 36 In evaluation of whether HTK clothed Mr. Campbell with the appearance of authority, we find two cases dealing with the investment context to be instructive. In *Harrison v. Dean Witter Reynolds, Inc.*, the Seventh Circuit, construing Illinois agency law, found that a brokerage firm did not manifest to investors the appearance of authority in its employees when the investors transferred money directly to the employees' personal account for investment rather than opening an account with the brokerage firm.[29] When the employees invested in high-risk put-options rather than the promised low-risk municipal bonds, the court held that the brokerage firm was not liable for the employees' actions.[30] Similarly, in *Kohn v. Optik, Inc.*, a federal district court found no apparent authority where the plaintiff "did not open a regular

---

[28] *City Elec. v. Dean Evans Chrysler-Plymouth*, 672 P.2d 89, 90 (Utah 1983).

[29] 974 F.2d 873, 883–84 (7th Cir. 1992).

[30] *Id.*

account with [the principal], . . . did not send her checks to the brokerage, and . . . never received a single receipt, statement, or other communication bearing [the principal]'s name."[31]   With these cases in mind, we turn now to the individual arguments of the Category Two Plaintiffs.

1.  Ella Dean Hunter

¶ 37   Ms. Hunter argues that she always believed there was a financial company backing her investment.  Ms. Hunter seeks to hold HTK liable, under the theory of apparent authority, based primarily on a business card that was given to her by Mr. Campbell.   The district court found that there was "no evidence that [Ms.] Hunter relied on any actions or manifestations of HTK regarding Mr. Campbell's alleged authority to sell investments in BHDC."   The district court further found that there was "no evidence" that Ms. Hunter "relied on the manifestations of HTK in making her decision to invest in BHDC."

¶ 38   Ms. Hunter never purchased any investment products from Mr. Campbell while he was a registered representative of HTK.  Instead, Ms. Hunter had a previous investment through Pacific Life that she purchased from Mr. Campbell while he was associated with a previous broker-dealer.  Her next investment with Mr. Campbell came after his termination from HTK, in April 2003, when she purchased BHDC notes.  In order for there to be a manifestation of authority, "the principal . . . must cause third parties to believe that the agent is clothed with apparent authority."[32]   The business card, alone, is not sufficient to constitute a manifestation of authority.[33] Without a manifestation

---

[31] No. CV 92-12881 LGB (BX), 1993 WL 169191, at *7 (C.D. Cal. Mar. 30, 1993).

[32] *City Elec.*, 672 P.2d at 90.

[33] *See Long v. Aronov Realty Mgmt., Inc.,* 645 F. Supp. 2d 1008, 1034 n.57 (M.D. Ala. 2009) ("[I]t is also common knowledge that business cards are easy to acquire or improperly used, and that a third party's reliance on the agent's authority to act should be based on something other than just a business card."); *CSX Transp., Inc. v. Recovery Express, Inc.*, 415 F. Supp. 2d 6, 11 (D. Mass. 2006) (explaining that the court "could find no cases where . . . giving someone a business card with the company

of authority traceable to HTK, there can be no apparent authority as applied to Ms. Hunter. We therefore uphold the district court's grant of summary judgment in favor of HTK on Ms. Hunter's claims based on apparent authority.

2. Terry Jordan

¶ 39    Mr. Jordan did not meet with Mr. Campbell until after Mr. Campbell had terminated his relationship with HTK. Mr. Jordan argues that Mr. Campbell had given him a business card identifying HTK, that HTK was aware of Mr. Jordan's relationship with FSFG, and that knowledge amounted to a manifestation of authority. As with Ms. Turner, we find that the business card alone is not sufficient. For example, Mr. Jordan "did not open a regular account with [the principal], [he] did not send [his] checks to the brokerage, and [he] never received a single receipt, statement, or other communication bearing [the principal]'s name."[34]    Thus, Mr. Jordan has not presented sufficient evidence to generate a genuine issue of material fact regarding HTK's manifestation of authority. Therefore, we affirm the district court's grant of summary judgment for HTK.

3. Michael and Teri Marquez

¶ 40    The Marquezes met with Mr. Campbell for the first time after his termination from HTK. The crux of their argument on appeal is that they met with Mr. Wheeler, as a registered HTK representative, and Mr. Wheeler referred them across the hall to Mr. Campbell. They contend that Mr. Wheeler's actions are sufficient to meet the element that "the principal has manifested his [or her] consent to the exercise of such authority or has knowingly permitted the agent to assume the exercise of such authority."[35] We disagree. A mere referral does not amount to a manifestation of authority to act in the name of a principal empowered to do so by apparent authority. In fact, a referral may very well imply the opposite in the context of authority—that the

---

name or logo, access to a company car, or company stationery, *by themselves,* created sufficient indicia of apparent authority").

[34] *Kohn*, 1993 WL 169191, at *7.

[35] *Luddington*, 855 P.2d at 209 (alteration in original).

scope of Mr. Wheeler's authority was less than or different from Mr. Campbell's such that a referral was required. Therefore, we affirm the district court's grant of summary judgment as to the Marquezes' claims based on apparent authority.

## II. THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION WHEN IT DECLINED TO ADDRESS PLAINTIFFS' NEGLIGENCE AND CONTROL-PERSON LIABILITY CLAIMS ON MOTION FOR RECONSIDERATION

¶ 41    Plaintiffs next contend that the district court erred when it granted summary judgment for their claims of negligence and control-person liability. We disagree and affirm the district court ruling.

¶ 42    In their motion for reconsideration on November 10, 2010, plaintiffs proffered new evidence of control liability and asserted a general negligence claim for the first time.[36] As we explained above, "postjudgment motions to reconsider are not recognized anywhere" in our rules of procedure;[37] therefore, "trial courts are under no obligation to consider motions for reconsideration" and "any decision to address or not to address the merits of such a motion is highly discretionary."[38] We now evaluate whether the district court abused its broad discretion in declining to address the new claims on a motion to reconsider.

### A. Negligence Claim

¶ 43    In plaintiffs' Third Amended Complaint, they alleged a count of "Negligent Training and Supervision" on the part of HTK. They argued that HTK placed Mr. Campbell "in a position of trust and reliance," that HTK "did not adequately train" Mr. Campbell, and that HTK "did not adequately supervise" Mr. Campbell. In their motion for summary judgment, plaintiffs

---

[36] Plaintiffs contend that they raised their negligence issue prior to the motion for reconsideration. For the reasons explained below, we disagree.

[37] *Gillett v. Price*, 2006 UT 24, ¶ 6, 135 P.3d 861.

[38] *Tschaggeny v. Milbank Ins. Co.,* 2007 UT 37, ¶ 15, 163 P.3d 615; *see supra* ¶ 34.

asserted that "HTK had an affirmative duty to supervise its Five Star office and customers." At oral argument, the district court asked plaintiffs' counsel, "When you say negligent claim, we're talking about negligent supervision?" Counsel's response was unequivocal: "Yes, your honor." Counsel then stated that plaintiffs' allegation was that HTK was "primarily liable on the negligence claim" because "[t]hey still have to supervise their own customers." However, counsel went on to explain that HTK's duty related to the agency relationship with Mr. Campbell, arguing that if HTK failed to inform the customers of Mr. Campbell's termination, "the agency continues." Thereafter ensued a lengthy discussion about agency law and whether Mr. Campbell had apparent authority. Ultimately, the district court understood and ruled on this argument as rooted in a "duty to supervise Mr. Campbell aris[ing] from Mr. Campbell selling BHDC as either a registered representative of HTK or as its alleged agent."

¶ 44 In their motion for reconsideration, plaintiffs restyled their argument as a broad negligence count, independent of any claim of deficient supervision or training of Mr. Campbell. At the hearing for the motion for reconsideration, the district court recognized that plaintiffs now suggested "that I should view this [claim] in light of a general negligence claim rather than the specific claims" that were pleaded during summary judgment. The court concluded, however, "I'm not inclined to do that, because I'm going to hold the parties to their pleadings."

¶ 45 On appeal, plaintiffs again assert their general negligence claim and allege that this was their argument all along, stating that they "tried in vain to explain" to the district court that their claim was based on "the duties HTK owed them directly as customers, regardless of [Mr.] Campbell." We are not persuaded. We have repeatedly explained that a party must "afford[] the district court a meaningful opportunity to rule on the ground that is advanced on appeal."[39] This means that, even if argued indirectly, the claim "must at least be raised to a level of

---

[39] *Hill v. Superior Prop. Mgmt. Servs., Inc.*, 2013 UT 60, ¶ 46, 321 P.3d 1054.

consciousness such that the trial judge can consider it."[40]  Based on the record, we cannot say that the court was given a meaningful opportunity to consider plaintiffs' claim that HTK owed a duty to its clients separate from its duty to supervise Mr. Campbell.

¶ 46   Consequently, plaintiffs did not bring this claim to the consciousness of the court until their motion for reconsideration. The claim was not asserted until well over a year after the order for summary judgment was entered, it was not based on any previously unavailable evidence, and plaintiffs do not assert any excuse or exceptional circumstances for not bringing the claim earlier.  We therefore conclude that the district court did not abuse its broad discretion in declining to address the claim brought for the first time on a motion for reconsideration.  We therefore affirm the district court ruling.

### B.  Control Liability Claim

¶ 47   The Manuses and the Marquezes argue that the district court erred when it struck evidence, offered for the first time on reconsideration, to support their theory of control-person liability. As part of their motion to reconsider, plaintiffs attached exhibits that consisted of additional Declarations of the Plaintiffs, a Central Registration Depository database summary listing Mr. Campbell's securities registration (CRD listing), a notice from NASD to members, and FINRA arbitration resolutions.  This evidence was an attempt to show that HTK "controlled" both Mr. Wheeler (as HTK's agent to the Marquezes) and Mr. Campbell (as HTK's agent to the Manuses).  HTK filed a motion to strike, which the district court granted in full.  Plaintiffs appeal the district court's rejection of their control-personal liability claim.

¶ 48   As with their general negligence claim, plaintiffs did not present this issue in their Third Amended Complaint or at summary judgment.  Instead, plaintiffs raised control liability as a theory of recovery for the first time in their motion for reconsideration.  The district court struck the evidence proffered on reconsideration by plaintiffs as untimely because the evidence was available prior to HTK's motion for summary judgment.

---

[40] *R.C.S. v. A.O.L. (In re Baby Girl T.),* 2012 UT 78, ¶ 34, 298 P.3d 1251 (internal quotation marks omitted).

The evidence in question and the new control liability theory were presented three years after fact discovery and seventeen months after summary judgment was granted. Therefore, as with the negligence claim, we hold that the district court did not abuse its discretion when it declined to consider the newly presented evidence and claim. We thus affirm the district court's ruling on the control liability claim.

### III. THE DISTRICT COURT DID NOT ERR WHEN IT GRANTED SUMMARY JUDGMENT ON PLAINTIFFS' MATERIAL AID CLAIM

¶ 49    Plaintiffs also contend that HTK is jointly and severally liable for materially aiding Mr. Campbell in the sale of the BHDC notes under Utah Code section 61-1-22(4)(a). They argue that the district court erred when it denied their material aid claim.

¶ 50    We first address HTK's contention that this argument is not preserved. Plaintiffs first raised this argument in their motion for reconsideration. Nonetheless, it appears the district court considered this argument on its merits.[41] We note again that "trial courts are under no obligation to consider motions for reconsideration."[42] That being said, if a trial court decides, in its discretion, to address the merits of a claim raised for the first time in a motion to reconsider, that claim is preserved.[43] Thus, though plaintiffs raised the material aid claim for the first time in the motion to reconsider, the district court, both at oral argument and

---

[41] This appears to be the case because plaintiffs apparently did not submit new evidence at the reconsideration stage but instead relied on previously admitted evidence to bring their material aid theory. In contrast, the district court did not address the control liability claim on its merits because the court struck the evidence supporting that theory as untimely.

[42] *Tschaggeny v. Milbank Ins. Co.*, 2007 UT 37, ¶ 15, 163 P.3d 615.

[43] *See Brookside Mobile Home Park, Ltd. v. Peebles*, 2002 UT 48, ¶ 14, 48 P.3d 968 ("[O]nce trial counsel has raised an issue before the trial court, and the trial court has considered the issue, the issue is preserved for appeal.").

in its order on the motion, expressly stated that it was considering the claim. We therefore determine that the issue was preserved.

¶ 51 We nonetheless affirm the district court's grant of summary judgment for HTK on the material aid claim. Plaintiffs claim that "HTK materially aided Five Star and Campbell's sales of BHDC . . . by failing to destroy Campbell and Five Star's apparent authority." Because we hold that all plaintiffs failed to establish apparent authority between HTK and Mr. Campbell,[44] this claim necessarily fails.[45]

## IV. THE DISTRICT COURT DID NOT ERR WHEN IT CONCLUDED THAT THE RELEASE SIGNED BY MR. HOWELL RELEASED HTK FROM LIABILITY FOR CLAIMS RELATED TO THE SALE OF BHDC NOTES

¶ 52 Plaintiff Grant Howell appeals the district court's grant of summary judgment in favor of HTK on the grounds that an agreement signed between him and Penn Mutual released his claims against HTK for liability related to the sale of BHDC promissory notes.[46]

¶ 53 In October 2002, while Mr. Campbell was a registered agent of HTK, Mr. Campbell sold Mr. Howell a whole-life insurance policy through Penn Mutual (Policy Number 8129818).

---

[44] *Supra* Part I.

[45] Plaintiffs also contend that HTK "directly participated" in the BHDC sales because Mr. Wheeler told them about the investment and introduced them to Mr. Campbell. However, the court granted summary judgment for Mr. Wheeler on all claims against him; thus, his conduct cannot be the basis of HTK's liability. *See Holmstead v. Abbott G. M. Diesel, Inc.*, 493 P.2d 625, 627 (Utah 1972) ("[A]bsent any delict of the master other than through the servant, the exoneration of the servant removes the foundation upon which to impute negligence to the master."), *superseded by statute on other grounds as recognized in Krukiewicz v. Draper*, 725 P.2d 1349 (Utah 1986); RESTATEMENT (THIRD) OF AGENCY § 7.03 cmt. b (2006) ("[A] principal's vicarious liability turns on whether the agent is liable.").

[46] HTK is a wholly-owned subsidiary of Penn Mutual.

In November 2002, Mr. Howell purchased BHDC notes through Mr. Campbell, investing over $100,000. On June 25, 2004, Mr. Howell sent a letter to Penn Mutual expressing dissatisfaction with Mr. Campbell and the policy sold to him by Mr. Campbell. Mr. Howell's letter also complained of the BHDC notes, referring to them as "a private placement investment that was supposed to be paying 12% interest." He noted that he later learned that the investment was "an unregistered security" and that both the investment and Mr. Campbell were being investigated. Mr. Howell requested a refund of the money he had invested in his life insurance policy ($30,000) as well as interest on the BHDC notes "at the minimum guaranteed rate on that money," threatening to hold Penn Mutual responsible for his approximately $100,000 investment in BHDC. Mr. Howell sent two more letters to Penn Mutual, dated September 20, 2004 and October 14, 2004. In response to Mr. Howell's letters, Penn Mutual sent two letters. The first letter was sent on July 20, 2004, by Robyn Label, Vice President of Market Conduct at Penn Mutual. Penn Mutual offered Mr. Howell a settlement equal to the cash surrender value of his life insurance policy at the time his policy was terminated, which was $10,639. The letter also contained a statement by Ms. Label that Penn Mutual was "not in a position to respond regarding the activities involving the private placement investment, as it was not sold through Penn Mutual." The second response letter was sent on October 28, 2004, by Lisa Gottlieb, Market Conduct and Compliance Specialist with Penn Mutual. Through this letter, Penn Mutual again offered Mr. Howell a settlement for $10,639, the cash surrender value of his life insurance policy. This letter reiterated the statement of Ms. Label in the first response letter, that Penn Mutual's "position remains the same regarding the activities involving the private placement investment, as it was not sold through Penn Mutual."

¶ 54 In February 2005, the parties executed the release agreement that is the subject of this appeal. Based on the Release, HTK moved for summary judgment against Mr. Howell for his claims relating to the BHDC notes. The district court granted summary judgment, concluding that the Release "is clear and unambiguous" and that "Mr. Howell released HTK and waived any claims against HTK." Mr. Howell now appeals that determination.

¶ 55 The parties agree that, under the terms of the Release, Pennsylvania law governs this issue. Under Pennsylvania law, the "fundamental rule in contract interpretation is to ascertain the intent of the contracting parties."[47] And when interpreting a written contract, "the intent of the parties is the writing itself."[48] Moreover, "[i]t is axiomatic that releases are construed in accordance with traditional principles of contract law."[49] Thus, "[t]he effect of a release is to be determined by the ordinary meaning of its language."[50] Finally, "all provisions in the agreement will be construed together and each will be given effect."[51]

¶ 56 We thus begin by looking to the language of the Release. Mr. Howell argues that the Release is at least ambiguous because, though it contains broad release language, it also contains "limiting language" that restricts the release to the life insurance policy referenced. The opening paragraph reads:

> The parties to the Agreement desire to settle and compromise all disputes and claims between them arising from the sale of Penn Mutual Policy Number 8129818 ("the policy") by Jeffrey Campbell to Mr. Grant Howell. Policy Number 8129818 was issued on October 28, 2002 with Mr. Grant Howell as owner and insured.

However, HTK cites the broad language of paragraph three to support its position that the intent of the parties to release all claims is clear and unambiguous. In relevant part, paragraph three states:

---

[47] *Ins. Adjustment Bureau, Inc. v. Allstate Ins. Co.*, 905 A.2d 462, 468 (Pa. 2006).

[48] *Id.*

[49] *Maloney v. Valley Med. Facilities, Inc.*, 946 A.2d 702, 706 (Pa. Super. Ct. 2008) (alteration in original).

[50] *Republic Ins. Co. v. Paul Davis Sys. of Pittsburgh S., Inc.*, 670 A.2d 614, 615 (Pa. 1995).

[51] *LJL Transp., Inc. v. Pilot Air Freight Corp.*, 962 A.2d 639, 647 (Pa. 2009).

> Mr. Howell . . . unconditionally releases and forever discharges Penn Mutual and its . . . subsidiaries, . . . employees and agents (not including Mr. Jeffrey Campbell) from any claims, losses, liabilities, damages, punitive damages, claims for attorneys' fees, causes of action or demands of any nature whatsoever, known or unknown, suspected or unsuspected, knowable or unknowable, . . . . which they ever had, now have or may have, arising from, or in any way related to his dealings with Mr. Campbell, including the solicitation, purchase, issuance, or administration of Penn Mutual Policy Number 8129818.

HTK argues that "the Release's broad language unquestionably bars Howell's claims," and thus summary judgment was proper. We agree.

¶ 57    Paragraph one provides the reason for the agreement in the first place—the "desire to settle" issues related to the insurance policy. However, there is no language that limits the Release from addressing other concerns between the parties. In fact, the broad language of paragraph three does just the opposite. In that paragraph, Mr. Howell agreed to discharge Penn Mutual (and its subsidiary HTK) "from any claims . . . of any nature whatsoever . . . arising from, or in any way related to his dealings with Mr. Campbell, including the solicitation, purchase, issuance, or administration of" the insurance policy. By "including" the insurance policy as one of the discharged claims, the Release, on its own terms, contemplated the possibility of other claims not referenced. In signing the Release, Mr. Howell agreed to forgo his rights to claims "of any nature whatsoever" related to his interactions with Mr. Campbell. We therefore determine that the plain language of the Release includes claims related to Mr. Campbell's sale of BHDC. Because we determine that the language is clear and unambiguous, "there is no need to resort to extrinsic aids or evidence."[52] That Mr. Howell may now regret his

---

[52] *Lesko v. Frankford Hosp.–Bucks Cnty.,* 15 A.3d 337, 342 (Pa. 2011).

decision is not grounds for an alternate interpretation.[53] Accordingly, we affirm the district court's grant of summary judgment for HTK.

### V. THE DISTRICT COURT ERRED WHEN IT DENIED ALL OF PLAINTIFFS' REQUESTS FOR ATTORNEY FEES

¶ 58    Finally, plaintiffs argue that the district court erred when it denied attorney fees in the trial of Mr. Campbell. Plaintiffs were entitled to pursue attorney fees under Utah Code section 61-1-22(1)(b), which allows a purchaser of a security to seek "reasonable attorney fees" if the seller of the security violates securities laws. Plaintiffs signed a contingency fee agreement with their legal counsel, and, after they succeeded at the district court against Mr. Campbell, sought an award of attorney fees based on this agreement. Plaintiffs' counsel submitted an affidavit of attorney fees that included forty-six dated and itemized entries of attorney time with detailed descriptions of work performed. The district court reviewed the affidavit and request for fees and expressed concern that the affidavit did not separate out fees based on successful and unsuccessful claims, which caused the district court concern.[54] The district court,

---

[53] *See id.* at 344 ("[T]he benefit of the bargain is whatever the parties are willing to exchange.").

[54] The court noted, "[O]ne of my concerns as I've gone through this, there has been a briefing of general attorney's fees, and I'm going to say general because we have entries literally dealing with hundreds of hours associated with various items. They're not the typical attorney's fee affidavit that the Court is used to seeing where there's a specific amount of time kept on a daily basis showing exactly how much time is used for various items. And that causes the Court to have concerns in two respects. First, as I looked at those entries, it appeared that a very substantial portion of that work was directed toward the claims against HTK, which up to this juncture have been disallowed. So why should Mr. Campbell be required to pay the attorney's fee associated with all of the work against HTK?"

relying primarily on *Kealamakia, Inc. v. Kealamakia,*[55] determined that it was impossible to separate the time spent on the distinct claims, and therefore impossible to determine whether the contingent fee request was reasonable.

¶ 59    Plaintiffs argue that the court erred when it attempted to distinguish between successful and unsuccessful claims because this was a contingency case, and that distinction is appropriate only for examination of attorney fees in a case billed by hourly rates. Plaintiffs also argue that it was an abuse of discretion to deny attorney fees related to the claim against Mr. Campbell after HTK had been dismissed on summary judgment, because at that point Mr. Campbell was the only remaining defendant and plaintiffs were successful in their claim against him at trial. We recognize that the "[c]alculation of reasonable attorney fees is in the sound discretion of the trial court, and will not be overturned in the absence of a showing of a clear abuse of discretion."[56] We also recognize that the district court "may, in its discretion, deny fees altogether for failure to allocate, . . . [and] may not award wholesale all attorney fees requested if they have not been allocated as to separate claims and/or parties."[57] The method for determining reasonable attorney fees has been well-established in our case law, and "as a practical matter the trial court should find answers to four questions":

1.  What legal work was actually performed?

2.  How much of the work performed was reasonably necessary to adequately prosecute the matter?

---

[55] 2009 UT App 148, ¶ 11, 213 P.3d 13 (concluding that a contingency fee agreement "is not determinative when calculating the appropriate amount of an attorney fee award").

[56] *Dixie State Bank v. Bracken*, 764 P.2d 985, 988 (Utah 1988) (citation omitted).

[57] *Valcarce v. Fitzgerald*, 961 P.2d 305, 318 (Utah 1998).

3. Is the attorney's billing rate consistent with the rates customarily charged in the locality for similar services?

4. Are there circumstances which require consideration of additional factors, including those listed in the Code of Professional Responsibility? [58]

¶ 60 The district court made no findings as to the four questions above. The district court determined only that it was impossible to separate the time spent on the separate Campbell and HTK claims, and therefore impossible to determine reasonable attorney fees. Thus, the district court denied the attorney fee request in its entirety. After reviewing the affidavit submitted by counsel, we hold that the district court abused its discretion when it denied attorney fees entirely and failed to make any findings relevant to the four questions above. There was no dispute as to the hourly rate presented by plaintiffs' counsel, and the affidavit clearly identifies 282 hours attributable only to the prosecution of the Campbell claim, amounting to $84,600. Despite the broad authority granted the district court in the determination of attorney fees, this broad authority is not an invitation to forego a reasoned analysis or attempt to parse out an appropriate award of attorney fees.

¶ 61 We therefore reverse the rejection of plaintiff counsel's affidavit and resulting denial of attorney fees and remand for a determination of appropriate attorney fees. Plaintiffs are entitled to a reasonable attorney fee for the time spent pursuing the claim against Mr. Campbell for which they were successful at trial and which was adequately identified by their affidavit in sections 6(oo)–6(tt). With regards to the remaining time, the district court must conduct a reasonableness analysis and attempt to discern what fees may be divided between the Campbell claims and the HTK claims.

---

[58] *Dixie State Bank*, 764 P.2d at 990 (footnotes omitted); *see also Softsolutions, Inc. v. Brigham Young Univ.*, 2000 UT 46, ¶¶ 48–50, 1 P.3d 1095.

**CONCLUSION**

¶ 62  We affirm the district court's grant of summary judgment as to all plaintiffs for failing to demonstrate that genuine issues of material fact exist on the issue of HTK's liability under a theory of apparent authority. We conclude that the district court did not abuse its discretion when it declined to hear new evidence and claims on theories of HTK's negligence and control-person liability raised for the first time on a motion to reconsider. We affirm the district court's grant of summary judgment to HTK on plaintiffs' material aid theory. We hold that the district court did not err when it determined that the Release between Mr. Howell and HTK released his claims against HTK regarding the BHDC notes. Finally, we conclude the district court abused its discretion when it denied all attorney fees. In sum, we affirm in part and reverse in part, and remand to the district court for action consistent with this opinion.

––––––––––––