2019 UT App 128

## THE UTAH COURT OF APPEALS

MARIETTA BERGDORF, MEMB VENTURES LLC, AND MODERN
HEALTH CLINIC FOR ADVANCED MEDICINE LLC,
Appellants,
*v.*
SALMON ELECTRICAL CONTRACTORS INC.,
Appellee.

Opinion
No. 20171024-CA
Filed July 26, 2019

Second District Court, Farmington Department
The Honorable Thomas L. Kay
No. 150700260

Troy L. Booher, Beth E. Kennedy, and Maurice R.
Mitts, Attorneys for Appellants

Joseph E. Minnock, Attorney for Appellee

JUDGE DAVID N. MORTENSEN authored this Opinion, in which
JUDGE JILL M. POHLMAN concurred. JUDGE RYAN M. HARRIS
dissented, with opinion.

MORTENSEN, Judge:

¶1     Appellant Marietta Bergdorf appeals the district court's
grant of summary judgment in favor of Salmon Electrical
Contractors Inc. (Salmon) in which the court concluded that no
reasonable jury could find the existence of a valid contractual
relationship between Bergdorf and Salmon. We affirm.

BACKGROUND[1]

¶2      Bergdorf is a healthcare professional who, in 2012, purchased a building for use as a medical clinic. Although the building was move-in ready, Bergdorf wanted to remodel some areas of the building to better suit her needs (Project). Bergdorf reached out to Randy Krantz and asked if he was able to help her with both the financing and the construction work associated with the Project. Krantz had been involved in many construction projects as a general contractor, and he expressed a willingness to become involved with the Project, even taking Bergdorf to look at two other medical clinics he had constructed in the past. Bergdorf eventually became "comfortable" with Krantz "doing the construction" on the Project.

¶3      Bergdorf's initial plan was to finance the Project through a loan (Loan) with U.S. Bank (Bank). To secure the Loan, the Bank required Bergdorf and Krantz to submit, among other things, a building permit (Permit) and a contract outlining the work to be performed. But there was a problem: Krantz's contractor license was expired and he was therefore unable to obtain the Permit. So, Krantz arranged for Salmon—whom Krantz had worked with in the past, and who had a valid license—to be the general contractor.

¶4      Krantz thereafter acted as an intermediary between Bergdorf and Salmon, and he even visited the Project with Bergdorf and Salmon, but not with the two together, to discuss the budget and scope of the Project. Krantz testified that he "made a list of things that were going to be done in the contract .

---

1. When reviewing a district court's grant of summary judgment, we view the facts in the light most favorable to Bergdorf, the non-moving party. *See Raab v. Utah Ry. Co.*, 2009 UT 61, ¶ 3, 221 P.3d 219.

. . that identified the costs for each of the items that [Bergdorf] wanted done and the amount of . . . overhead that [Salmon] needed in the contract to do the job."

¶5    Krantz then prepared a proposed contract detailing Bergdorf's wishes for the property and the budget for each area of the remodel (Proposed Contract). The Proposed Contract recited that Bergdorf was the owner and that Salmon was the general contractor. Importantly, the parties never signed the Proposed Contract. Indeed, Bergdorf indicated at her deposition that she had never actually seen the Proposed Contract:

> [Attorney]: Let me show you . . . the proposed contract that was prepared by Randy Krantz. I think he indicated he prepared it and he submitted it to you and [Salmon], and I'm wondering whether or not you remember ever seeing this?
>
> [Bergdorf]: I've never seen this. I don't need to look. I have never seen it.
>
> [Attorney]: You have not seen it?
>
> [Bergdorf]: No.

¶6    Krantz also set about obtaining and gathering the other documents necessary to secure the Loan. Krantz asked Salmon to prepare certain documents, including a builder's statement, a W-9 form, and a credit authorization, that Salmon had filled out and signed in July 2012. Later that month, Krantz submitted the documents and unsigned Proposed Contract to the Bank as part of the Loan application.

¶7    In September 2012, while the Loan application was pending, Salmon obtained the Permit from Bountiful City for the Project. The Permit listed Bergdorf as the owner and Salmon as the general contractor. When the Permit was issued, Salmon's

secretary emailed Krantz a copy of the Permit. Bergdorf never saw the Permit or the Permit application, and understood that it had been procured under Salmon's name only because Krantz told her so. The Permit expressly stated, "This [P]ermit becomes null and void if work or construction authorized is not commenced within 180 days, or if construction or work is suspended or abandoned for a period of 180 days at any time after work is commenced."

¶8     Sometime in the fall of 2012, while the Loan application was still pending, Krantz hired a subcontractor to perform demolition work for the Project. The subcontractor removed some carpet from the building and demolished an interior wall. Importantly, Krantz did not inform Salmon or Bergdorf that he had arranged for this work to be completed. And when Krantz was asked at his deposition about Salmon's involvement with the demolition, he indicated that Salmon had none:

> [Attorney]: Okay. Because that contract was not signed, you undertook to hire [a subcontractor] to perform that work . . . ?
>
> [Krantz]: Right. . . .
>
> [Attorney]: Okay. So Salmon, to your knowledge, had no involvement with hiring [the subcontractor]?
>
> [Krantz]: No.
>
> [Attorney]: Is that correct, [Salmon] didn't have any involvement?
>
> [Krantz]: None.

Krantz also stated that Salmon's Permit was not used for this demolition work or any work that was done on the Project, at any time:

> [Attorney]: Did [Salmon] hire any general contractors?
>
> [Krantz]: I—I don't think so.
>
> [Attorney]: Any subcontractors?
>
> [Krantz]: There was never—the [P]ermit was never used. There was never any work done on this [Permit]. There was a contract—a building contract was drawn up that was—[Bergdorf] had a copy, the [B]ank had a copy that has never been signed. So if the—there was never anything done because the [P]ermit—or the [Loan] had never been closed.

Upon learning that the wall had been demolished, Bergdorf was unhappy with Krantz. Though she had spoken with Krantz about the possibility of removing the wall, she did not consider the plan finalized. After this episode, Bergdorf told Krantz to stop construction because funds were not yet available from the Loan.

¶9      After the demolition was performed in the fall of 2012, no additional work was completed on the Project for the next two years. Bergdorf testified that although the Loan was eventually approved, she "was very busy" and decided to "[give] up" on closing the Loan and starting work on the Project. Because construction did not commence on the Project, Salmon's Permit self-terminated.

¶10     In September 2013, about one year after the unauthorized demolition, Bergdorf contacted Bountiful City and, without Salmon's knowledge or consent, somehow "renewed" the

Permit.[2] Neither Bergdorf nor Bountiful City contacted or otherwise notified Salmon about the renewal.

¶11    With a renewed Permit in hand, Bergdorf independently obtained bids from several contractors, and because Krantz submitted the low bid, Bergdorf entered into a new contract with him to act as the general contractor. Salmon was not invited to bid, nor did Krantz or Bergdorf contact Salmon about serving as the general contractor. Indeed, Bergdorf testified that when the Project resumed in 2014, she had no general contractor in place:

> [Attorney]: [L]et me ask you this: Who did you view as the general contractor for that work in 2014?
>
> [Bergdorf]: I didn't have anyone.

Further, Bergdorf plainly stated that she never had any kind of contractual relationship with Salmon, at any time:

> [Attorney]: And you, yourself, never entered into any contractual relationship with Salmon to do either any subcontract work or general contracting work?
>
> [Bergdorf]: No.
>
> [Attorney]: Is that correct?

---

2. In ruling on the summary judgment motion, the district court expressly determined that the Permit expired and that certain steps were required to renew it. The court ruled, "These steps were not taken and, therefore, as a matter of law, the [P]ermit could not be extended." Bergdorf has not challenged this determination.

[Bergdorf]: Yes. Correct.

Later in her deposition, Bergdorf was asked to explain why Krantz was not listed on the Permit when it was renewed. Bergdorf testified as follows:

> [Bergdorf]: In the beginning as we restarted or rekindled that working relationship, I said don't you want to change [the Permit] with the City, because it was due for renewal. I said don't you want to change it under your name. [Krantz] said, no, it doesn't matter. We'll continue under [Salmon].
>
> [Attorney]: In terms of who the [P]ermit would be under?
>
> [Bergdorf]: Yes. As a general contractor.
>
> [Attorney]: But all of your contractual relationships were directly with [Krantz]?
>
> [Bergdorf]: Yes.
>
> [Attorney]: Okay.
>
> [Bergdorf]: I don't know contract. All my relationships were with [Krantz].

¶12    Bergdorf and Krantz entered into a contract under the newly submitted Krantz bid—which Krantz did not purport to be on behalf of Salmon—and resumed work on the Project in 2014. At this time, Bergdorf viewed Krantz, and only Krantz, as the general contractor. Accordingly, Krantz hired subcontractors, obtained materials, and performed labor. In turn, Bergdorf issued payments to Krantz and his company, Eastwind. Bergdorf testified that she believed use of Salmon's Permit was

proper, despite the fact that she issued payments only to Krantz, because Krantz told her, "[Salmon] is [my] friend and partner and [I] work[] with [Salmon, so] it doesn't really matter." In January 2015, Bergdorf's lawyer wrote Krantz to terminate him from the Project.

¶13   Later, an allegedly unpaid subcontractor sued Bergdorf and sought to foreclose a mechanic's lien on the Project. In response, Bergdorf filed a third-party complaint against Krantz seeking damages for the $130,000 she had paid Krantz and for physical damage to the building that left the building unsafe and unusable. Only later did Bergdorf recall that Salmon was identified as the general contractor on the Permit obtained in 2012 in connection with the abandoned Loan. Based upon Salmon's name being on the Permit, Bergdorf sued Salmon.

¶14   Salmon filed a motion for summary judgment, arguing that it had never consummated a contractual relationship with Bergdorf, that Bergdorf's only true contractual relationship was with Krantz, and that Krantz was not Salmon's agent. Salmon also pointed to Bergdorf's deposition testimony that "all of [Bergdorf's] contractual relationships were directly with [Krantz]" and "[a]ll [Bergdorf's] relationships were with [Krantz]." After briefing and oral argument, the district court granted Salmon's motion.

¶15   Bergdorf appeals.

ISSUE AND STANDARD OF REVIEW

¶16   Bergdorf argues that the district court erred in granting summary judgment, because there is sufficient evidence that a contractual relationship between her and Salmon exists and therefore Salmon is not entitled to judgment as a matter of law. We review a "grant of summary judgment for correctness, granting no deference to the district court's legal conclusions."

*Salt Lake City Mission v. Salt Lake City*, 2008 UT 31, ¶ 5, 184 P.3d 599.

ANALYSIS

¶17 Bergdorf argues that the evidence in this case is sufficient to show that a contractual relationship between her and Salmon exists either directly or through Krantz acting as Salmon's agent. We will first address the issue of agency and thereafter the existence, or nonexistence, of a contract.

I. Apparent Authority to Enter a Contract

¶18 Bergdorf does not contend that Krantz had "actual authority" to act on behalf of Salmon. *See Grazer v. Jones*, 2012 UT 58, ¶ 10, 289 P.3d 437 (discussing that a principal may provide an agent with "actual authority" to perform certain actions on its behalf). Bergdorf does argue, however, that Salmon cloaked Krantz with "apparent authority" to act as its agent. *See id.* ¶ 11 (discussing that a principal may create an agency relationship by taking actions that "support a third party's reasonable belief that the agent has the authority to act"). We conclude that Salmon did not undertake actions, or remain silent, in such a way that a jury could find that Bergdorf reasonably believed that Salmon had clothed Krantz with apparent authority to enter into a contract with her on Salmon's behalf.

¶19 Our supreme court has articulated a three-part test to determine whether an agent has apparent authority to perform certain acts on behalf of a principal:

> (1) that the principal has manifested his or her consent to the exercise of such authority or has knowingly permitted the agent to assume the exercise of such authority;

(2) that the third person knew of the facts and, acting in good faith, had reason to believe, and did actually believe, that the agent possessed such authority; and

(3) that the third person, relying on such appearance of authority, has changed his or her position and will be injured or suffer loss if the act done or transaction executed by the agent does not bind the principal.

*Burdick v. Horner Townsend & Kent, Inc.*, 2015 UT 8, ¶ 23, 345 P.3d 531 (cleaned up).

¶20    "Where corporate liability is sought for acts of its agent under apparent authority, liability is premised upon the corporation's knowledge of and acquiescence in the conduct of its agent which has led third parties to rely upon the agent's actions." *City Elec. v. Dean Evans Chrysler-Plymouth*, 672 P.2d 89, 90 (Utah 1983) (cleaned up). "Nor is the authority of the agent apparent merely because it looks so to the person with whom he deals." *Id.* (cleaned up). "It follows that one who deals exclusively with an agent has the responsibility to ascertain that agent's authority despite the agent's representations." *Id.* (cleaned up); *see also Sutton v. Byer Excavating, Inc.*, 2012 UT App 28, ¶ 12, 271 P.3d 169; *Bodell Constr. Co. v. Stewart Title Guar. Co.*, 945 P.2d 119, 124 (Utah Ct. App. 1997). Accordingly, apparent authority cannot be premised on the manifestations of the purported agent. *City Elec.*, 672 P.2d at 90; *see also Zions First Nat'l Bank v. Clark Clinic Corp.*, 762 P.2d 1090, 1095 (Utah 1988).

¶21    Here, Bergdorf did nothing to ascertain Krantz's authority, nor does she claim that she did. And now, on appeal, Bergdorf attempts to look at the totality of the circumstances to find apparent authority instead of focusing on Salmon's manifestations *to* her. Applying the facts of this case to the controlling law—particularly the analysis outlined in *Burdick*—

leads to a conclusion that apparent authority cannot be found here. Under *Burdick*, all three factors must be shown. 2015 UT 8, ¶ 23; *accord Luddington v. Bodenvest Ltd.*, 855 P.2d 204, 209 (Utah 1993); 3 Am. Jur. 2d *Agency* § 80 (2019). We address each of the *Burdick* factors in turn.

A.     Whether Salmon manifested its consent for Krantz to enter into a contract with Bergdorf on Salmon's behalf

¶22     The first *Burdick* factor is whether "the principal has manifested his or her consent to the exercise of such authority or has knowingly permitted the agent to assume the exercise of such authority." 2015 UT 8, ¶ 23 (cleaned up). To be clear, the law focuses not on just any manifestation, but only on manifestations of the principal (i.e., Salmon) to the third party (i.e., Bergdorf). See id. ¶ 22. There is simply no evidence in the record that Salmon manifested its consent to Krantz to contract with Bergdorf on Salmon's behalf. Bergdorf points to three facts she claims meets this factor: (1) Salmon's secretary signed and paid for the Permit for the Project, (2) Salmon filled out and allowed to be submitted a number of documents connected with the Loan application,[3] and (3) Krantz had been telling Bergdorf all along that he was acting through Salmon. These facts do not constitute manifestations of consent to Krantz's exercise of authority.[4]     First,     representations     by     Krantz     are     not

_____

3. Bergdorf notes that in July 2013, Krantz sent some documents to Salmon to review. Among those documents was an assignment document that references a contract. There is no evidence in the record that Bergdorf ever knew of the assignment document, nor is there any evidence that Salmon signed the assignment.

4. In addition to the three facts identified by Bergdorf, the dissent relies on additional facts to find support for Bergdorf's

(continued…)

manifestations of the principal—Salmon. Second, Bergdorf's two remaining alleged manifestations of consent go only to whether Salmon agreed to act as a general contractor in connection with the Loan that never closed. These were not manifestations endowing Krantz with apparent authority to bind Salmon to a contract. Thus, manifestations of "such authority"—in this case, the authority to enter into a contract—are simply missing as a matter of law.

---

(…continued)

position that Salmon clothed Krantz with authority to enter into a contract on Salmon's behalf. *Infra* ¶ 48. First, the dissent argues that Salmon conferred authority on Krantz because Salmon had worked with Krantz on over one hundred construction projects and they were business partners on another. These facts do not demonstrate a manifestation of Salmon's consent to Krantz entering into a contract on its behalf. As an initial matter, there is no indication in the record that Bergdorf was ever aware of these facts, let alone during the relevant time period (2012–2014). Further, the fact alone that Krantz and Salmon had worked together in the past does not show or even imply that Krantz was authorized to enter into contracts for Salmon.

Second, the dissent relies on the fact that Krantz listed himself as a project manager for Salmon in a 2013 email concerning renewal of the Permit. *Infra* ¶ 48. This email, however, is the manifestation of Krantz, not Salmon—and was sent in an effort to renew Salmon's Permit without Salmon knowing. Further, Krantz sent this email in May 2013 after the Permit had self-terminated and after Bergdorf had solicited new bids for the Project. In other words, Salmon was no longer involved in the Project at the time this email was sent. Thus, this 2013 email cannot lend support to the dissent's conclusion that a reasonable jury could find apparent authority "at least during the 2012 part of the project's timeframe." *Infra* ¶ 55.

B.   Whether Bergdorf knew of the manifestations, had reason to believe, and did actually believe, that Krantz had authority to bind Salmon

¶23   The second *Burdick* factor is whether the "third person knew of the facts *and*, acting in good faith, had reason to believe, *and* did actually believe, that the agent possessed such authority." 2015 UT 8, ¶ 23 (emphasis added) (cleaned up). As stated above, all three *Burdick* factors must be shown to establish apparent authority. *Id.* Likewise, all three discrete components of the second *Burdick* factor must be shown. *See id.* Thus, to satisfy the second *Burdick* factor, Bergdorf must have (1) known of the "facts" (manifestations of authority), (2) had reason to believe, and (3) actually believed that Krantz had authority to bind Salmon contractually. *See id.* But because Bergdorf did not know of the facts now claimed in support of a finding of apparent authority, none of these assumed facts can establish a reasonable belief of apparent authority under the law.

¶24   Specifically, there is no evidence in the record that Bergdorf had any knowledge—at the relevant time—of Salmon applying for or paying for the Permit. The record actually establishes that Bergdorf first learned of Salmon's obtaining the Permit when the construction recommenced in 2014. Likewise, there is no evidence that Bergdorf was aware of any of the documents that Salmon allegedly filled out in connection with the Loan application. Whether others may have known of these facts is immaterial. To rely on a theory of apparent authority to bind Salmon, it is Bergdorf who must have known of these facts.

¶25   Perhaps even more importantly, there is no evidence in the record that Bergdorf actually believed that Krantz was acting as Salmon's agent for the purpose of entering into a contract. Indeed, when deposed, Bergdorf testified that all of her contractual relationships were directly with Krantz. Granted, Bergdorf's testimony was inconsistent as to whom she thought

was acting as the general contractor. But Bergdorf did not claim that she thought she had a contract with Salmon. Nor does Bergdorf's testimony establish that she believed Krantz was Salmon's agent.[5] At most, a jury could reasonably infer only that Bergdorf believed Salmon had agreed to serve as the general contractor for the Project if the Loan closed—but it never did.

¶26 At oral argument on appeal, Bergdorf relied heavily on an email sent by the Bank confirming that Salmon was approved as the general contractor. This email confirmed only the understanding that Salmon agreed to act as the general contractor if the Loan was approved. But it does not support a finding that Bergdorf reasonably believed that Krantz had the authority to agree to the terms of a contract with Bergdorf on Salmon's behalf. Similarly, Salmon's silence at that time signifies

---

5. The dissent argues that a jury could reasonably infer such belief from Bergdorf's statement, "I don't know contract." We disagree. On summary judgment all *reasonable* inferences are made in the non-moving party's favor, *Heslop v. Bear River Mutual Ins. Co.*, 2017 UT 5, ¶ 21, 390 P.3d 314, but the non-moving party is not entitled to unreasonable inferences, *id.* ("[T]o be reasonable, the inference must present something more than pure speculation."). Here, Bergdorf's testimony can be construed as a representation either that she did not hold such a belief or that she had no belief one way or the other. To construe Bergdorf's statements as expressing an actual belief that Krantz had authority to bind Salmon stretches the permissible inference beyond reasonableness to speculation. Under oath, Bergdorf testified that she did not enter into a contract with Salmon. And later in her deposition when she stated, "I don't know contract," she then broadly testified, "All my relationships were with [Krantz]." The only reasonable inference—in context—is that Bergdorf's actual belief was that *all* of her relationships—contractual or otherwise—were with Krantz.

little as to the apparent authority of Krantz to contract on Salmon's behalf. Since no contract had been entered into, and no funding had yet been obtained, Salmon had no reason to object to the Bank's email. It was true that should the Bank actually close the Loan, and should the parties agree on the terms of a contract, Salmon was agreeable to serving as the general contractor. But this email, which was not even copied to Krantz, did not manifest Salmon's intent that Krantz act as Salmon's agent.

C.     Whether Bergdorf changed her position in reliance on Salmon's manifestations

¶27    The third *Burdick* factor is whether Bergdorf, "relying on such appearance of authority, has changed [her] position and will be injured or suffer loss if the act done or the transaction executed by [Krantz] does not bind [Salmon]." *See* 2015 UT 8, ¶ 23 (cleaned up). In this case, the record reflects no change of position or injury suffered by Bergdorf flowing from any reliance on Krantz's apparent authority. Initially, this third factor must still be connected to the manifestations, or "the facts," identified in the first two factors. In this case, the record establishes that at no relevant time did Bergdorf even know of "the facts"—that the Loan documents signed by Salmon had been submitted to the Bank or that Salmon had submitted an application and paid for the Permit. In short, Bergdorf cannot rely on knowledge she did not have. *See Luddington v. Bodenvest Ltd.*, 855 P.2d 204, 210–11 (Utah 1993).

¶28    Further, Bergdorf cannot show a change of position or injury stemming from reliance on Krantz's alleged apparent authority in connection with the 2012 demolition work because Bergdorf did not authorize that work. The record exhibits that Krantz undertook—and paid for—the demolition without informing Salmon or Bergdorf. Indeed, "upon learning that the interior wall had been demolished, Bergdorf was

unhappy, stating that she had only wanted the carpet to be removed at the time. Though she had spoken with Krantz about the possibility of removing the wall, she did not consider the plan finalized."[6] One can hardly claim that Bergdorf acted in reliance on Salmon's alleged manifestation of Krantz's authority when she only found out about this activity after the fact, claimed to have not wanted it to happen, and did not consider the plans finalized.

¶29 The only thing Bergdorf apparently did—based upon Salmon's agreement to serve as the general contractor—was apply for the Loan, which never closed. Because the Loan never closed, no work was done pursuant to that financing. Further, Salmon did not engage any subcontractors to do anything. The fact that Krantz, unbeknownst to both Bergdorf and Salmon, hired a subcontractor to perform demolition work that was not approved by Bergdorf or Salmon, cannot be considered reliance by Bergdorf on Salmon's manifestations. In other words, the record does not support the assertion that Bergdorf initiated any work based upon the belief that she had a contract with Salmon to be her general contractor.

¶30 When work recommenced in 2014, Bergdorf testified that she viewed Krantz, not Salmon, as her general contractor—and

---

6. Indeed, this testimony is consistent with Bergdorf's third-party complaint which alleges: "Krantz, before approval to proceed with work and approval of plans and the scope of work, entered the Property and removed carpet, demolished walls, and removed other property leaving the Property in an unsafe and unusable state resulting in more expense for [Bergdorf]." We find no support in the record, and indeed Bergdorf did not allege below, that she authorized Krantz to begin work on the Project as stated in the dissent. *See infra* ¶ 54.

Bergdorf viewed Krantz as such for the remainder of 2014.[7] Accordingly, neither the work in 2012 (the demolition that Bergdorf was unaware of) nor the work in 2014 (where Bergdorf believed Krantz was the general contractor) meets the requirement of reliance.[8]

¶31 Under these facts, reasonable minds could not differ in concluding that apparent authority did not exist. *Penunuri v. Sundance Partners, Ltd.*, 2017 UT 54, ¶ 33, 423 P.3d 1150 (holding that summary judgment should be granted when reasonable minds could not differ). Accordingly, to the extent the district court's ruling depends on the existence of apparent authority, it was correct in granting summary judgment.

## II. Contract

¶32 Because Bergdorf cannot show that Salmon cloaked Krantz with apparent authority, it follows that a jury could not

---

7. The payments Bergdorf made all occurred in 2014 or later when Bergdorf considered Krantz to be the general contractor and when Bergdorf and Krantz had completely bypassed Salmon and engaged subcontractors on their own. Accordingly, such payments cannot constitute reliance on apparent authority.

8. Bergdorf also notes that Krantz told her that Salmon was his "partner" and was going to act as the general contractor. *See infra* ¶¶ 53–54. But this testimony from Bergdorf was referring to a conversation in 2014, after Bergdorf had solicited new bids for the Project, and when Krantz was explaining how they (Bergdorf and Krantz) could renew the building Permit using Salmon's name. However, even at that time, Bergdorf testified that she believed Krantz, not Salmon, to be the general contractor under the newly accepted bid. And in any event, the representations of Krantz are not manifestations of Salmon.

find that Krantz entered into a contractual relationship with Bergdorf on Salmon's behalf. If anything, the only agreement between Salmon and Bergdorf (via Krantz) was for Salmon to act as a general contractor for the Project funded by a Loan from the Bank. Since the Loan never closed, no contractual obligations attached to Salmon. Indeed, it would likely come as a shock to many contractors that a preliminary agreement to act as a general contractor contractually obligates them to be answerable in damages for any work done on that project when they never agreed to terms, did not oversee the work, and were not paid for doing the job. Thus, we agree with the district court's conclusion that there was never mutual assent sufficient to form a contract.

¶33 On summary judgment, Bergdorf is entitled to have factual inferences construed in her favor. *Heslop v. Bear River Mutual Ins. Co.*, 2017 UT 5, ¶ 15, 390 P.3d 314. However, the court is not required to draw every possible inference of fact, no matter how remote or improbable, in her favor. *See id.* ¶ 21. Rather, Bergdorf is only entitled to reasonable inferences. *See id.* ("[T]o be reasonable, the inference must present something more than pure speculation.").

¶34 Bergdorf concedes that there was neither a signed offer nor an acceptance as between Bergdorf and Salmon. Nevertheless, Bergdorf urges us to hold that issues of fact exist whereupon a jury could conclude that the parties mutually assented through conduct. Again, Bergdorf focuses on the representations of Krantz and thus is dependent on apparent authority and the specific representation of Krantz that Salmon was his friend and partner. In our view, this contorts the evidence beyond any reasonable inference. As previously pointed out, the conversation about Salmon being Krantz's "partner" took place in 2014, after the Permit had expired and after Bergdorf had abandoned the Loan. At best, Krantz was representing—without Salmon's knowledge—that he could use his "partner's" contractor's license to renew the Permit.

¶35    Bergdorf places great significance on the fact that Salmon agreed to act as a general contractor if and when Bergdorf's Project moved forward with Bank financing. But that Loan never closed. The record in this case demonstrates that Bergdorf did not think she had a contract with Salmon. At most, there was an agreement to act as a general contractor on a remodeling project that was not defined or funded. A preliminary agreement to act as a general contractor on an undefined project, contingent on financing, neither establishes a basis for finding that a contract exists or otherwise concluding that an implied contract resulted. Similarly, while Bergdorf argues that Salmon's silence in response to a single email from the Bank—approving Salmon as a general contractor—ratified something, we are hard pressed to see how that silence ratified anything other than the same agreement to serve as a general contractor *if* the Project proceeded and *if* the Project was funded.[9]

¶36    Further, as highlighted by the district court, it is undisputed that the Permit obtained by Salmon self-terminated when work was not commenced within, or ceased for a period of, 180 days. The demolition work was not completed by Salmon or at the direction of Salmon. And except for the demolition, no work was done for more than 180 days after the Permit was issued. Therefore, the Permit expired. Although the Permit was renewed, it is undisputed that it was renewed without the consent or knowledge of Salmon. And similarly, in 2014, when work was performed under the Permit, Salmon was not notified.

¶37    In any event, an implied contract based on mutual assent does not obtain under these facts. Bergdorf looks to *Ellsworth v. American Arbitration Ass'n*, 2006 UT 77, 148 P.3d 983, for the proposition that mutual assent can be evidenced by things other

---

9. We note that the theory of ratification by silence was not argued to the district court.

than a signed contract. This is a correct but incomplete statement of the law. First, the ultimate holding in *Ellsworth* was that a person's name appearing on an unsigned contract as a party—as is the case here—is not direct evidence of assent. *Id.* ¶ 18. This is especially true here, where there is no evidence that Salmon (or Bergdorf) participated in any way in negotiating or drafting Krantz's Proposed Contract. Second, when mutual assent is based on conduct or performance, the law requires that words or actions of a party must be reasonably "'interpretable as indicating an intention to make a bargain with *certain terms or terms which reasonably may be made certain.*'" *Heideman v. Washington City*, 2007 UT App 11, ¶ 25, 155 P.3d 900 (emphasis added) (quoting *Rapp v. Salt Lake City*, 527 P.2d 651, 654 (Utah 1974)). In *Heideman*, this court affirmed a grant of summary judgment and concluded that no mutual assent could be shown as a matter of law even though one of the parties had accepted payment. *Id.* ¶¶ 24, 27. The plaintiff in *Heideman*, a developer, argued that because Washington City accepted payment for sixty-six water impact fees at a lower rate, even though the rate had been raised effective the day the plaintiff paid, a contract had been formed and the higher rate could no longer be sought. *Id.* ¶¶ 2, 3, 9. This court determined that a contract could not be found because there was "no communication that would indicate any type of meeting of the minds." *Id.* ¶ 25. In short, the acceptance of payment without other terms was insufficient.

¶38 The same can be said here. There was simply no communication between Bergdorf and Salmon that exhibits a meeting of the minds on any certain terms. Indeed, it is undisputed that Bergdorf never saw, much less signed, the Proposed Contract. Bergdorf never met Salmon. Bergdorf and Salmon never agreed on a definite price. And Bergdorf testified that there was not a definite plan when Krantz ordered the demolition work to be completed in 2012. Likewise, there is no evidence Salmon agreed to perform any certain scope of the work for the Project. Therefore, we conclude that Salmon's

agreement to be listed as a general contractor and apply for the Permit in 2012, without more, did not indicate assent to a contract with certain terms sufficient to be binding. *See id.* ("'The application for an issuance of a building permit does not constitute a voluntary agreement between the parties to enter into binding contract.'" (quoting *Trevino & Gonzales Co. v. R.F. Muller Co.*, 949 S.W.2d 39, 42 (Tex. Ct. App. 1997))).

¶39    Bergdorf, as in her agency analysis, grounds her position on the activities of Salmon in supplying documents for the Loan. Again, the most that Salmon thereby assented to was to act as the general contractor if and when the Loan closed. It is an undisputed fact in this case that the Loan never closed. It is also undisputed that Bergdorf abandoned the Loan. The record is devoid of any evidence that Salmon agreed to do any work for any price to be paid directly by Bergdorf. Therefore, an implied contract simply does not exist.

¶40    Bergdorf also places weight on payments made during the Project. However, these payments were not made to Salmon; instead they were made to Krantz or entities owned by Krantz. Indeed, at any time that Bergdorf made payments related to the Project, she unequivocally testified that she thought Krantz, not Salmon, was her general contractor. These payments are therefore only possibly evidence of performance if Krantz is considered the agent of Salmon. Because we conclude that apparent authority cannot be found here, these payments are evidence that Bergdorf's contract, if it existed, was with Krantz and not Salmon.

¶41    Bergdorf also places significance upon the fact that, until December 2014, Salmon did not take any steps to remove its name from the Permit. But since the Permit had expired by its own terms and the Loan had never closed, there was no reason for Salmon to anticipate that Krantz would—without Salmon's knowledge—renew its expired Permit. Bergdorf and Krantz's

unauthorized renewal of the Permit cannot constitute assent by Salmon.[10]

¶42    For these reasons, we conclude that no contract between Bergdorf and Salmon was formed as a matter of law and that the district court therefore properly granted summary judgment in favor of Salmon.

## CONCLUSION

¶43    Bergdorf's position rests primarily on her reliance on Krantz's apparent authority to contract with Bergdorf on Salmon's behalf—with which we do not agree. Independently, the record does not support a conclusion that the parties entered into a contract as a matter of law. Because reasonable minds could not differ that the parties did not mutually assent, and no contract was formed as a matter of law, Salmon was entitled to summary judgment.

¶44    Affirmed.

——————

HARRIS, Judge (dissenting):

¶45    I would not characterize Bergdorf's claim against Salmon as a strong one. Odds are, she would not prevail at a trial on the merits against Salmon if she were ever afforded one. But our task in reviewing this appeal is not to assess who has the better

——————

10. Bergdorf also suggests that a walkthrough of the Project is evidence of assent. A walkthrough of a remodel project is part and parcel of any bid process and is hardly indicative of assent to contractual terms. Instead, a walkthrough is simply pre-contract due diligence.

claim, or predict who is most likely to prevail at trial. Rather, our task is to determine if "a reasonable jury" could find in favor of Bergdorf on her claim against Salmon, *see Helf v. Chevron U.S.A. Inc.*, 2015 UT 81, ¶ 4, 361 P.3d 63, and in making this determination, we must view the record evidence "in the light most favorable" to Bergdorf, the party who is resisting summary judgment, *see Raab v. Utah Ry.*, 2009 UT 61, ¶ 3, 221 P.3d 219.

¶46    The majority correctly recites this standard, *see supra* note 1, but I disagree that it has appropriately applied it. In my view, the majority emphasizes the (ample) evidence supporting Salmon's position, while minimizing some of the (less copious) evidence supporting Bergdorf's position. Certainly, the question about whether "a reasonable jury" could possibly find in favor of a party on a specific claim is the type of inquiry upon which reasonable minds might reasonably differ, and on the record presented here I respectfully disagree with the majority's general conclusion that no reasonable jury could possibly find for Bergdorf.

¶47    Chiefly, I disagree with the majority's conclusion that no reasonable jury could find that Krantz had apparent authority to act as Salmon's agent. The majority correctly recites the elements of apparent authority: (1) that the principal has either "manifested" consent to the agent's exercise of authority or at least "knowingly permitted the agent" to exercise authority; (2) that the third person, based on actions of the principal, reasonably believed that the agent had apparent authority; and (3) that the third person has relied to her detriment on the appearance of authority. *See Burdick v. Horner Townsend & Kent, Inc.*, 2015 UT 8, ¶ 23, 345 P.3d 531 (quotation simplified). But I disagree with the majority's application of those elements to the facts of this case.

¶48    The first *Burdick* factor is satisfied simply by the principal's manifestation of consent to the agent's exercise of

authority, or even by the principal's knowing decision to "permit[] the agent to assume the exercise of such authority." *Id.* (quotation simplified). And in this case there exists ample evidence to support a finding that Salmon took actions intended to clothe Krantz with authority to act as its agent on Bergdorf's Project. At trial, the jury would have learned, by way of background, that Salmon and Krantz had worked together on over a hundred construction projects, and that they were business partners in a commercial development project. Indeed, Krantz was familiar enough to Salmon's employees that he had the power to tell them to carry out tasks—like apply for and pay for the Permit—and they would follow Krantz's orders. On this particular Project, Salmon agreed—at Krantz's request—to act as the general contractor on Bergdorf's Project, and Salmon provided information to Krantz to assist him in drafting the written (but ultimately unsigned) Contract that listed Salmon as the contractor and Bergdorf as the client/owner. Salmon filled out a set of documents—including a W-9 form, a credit authorization, and a "builders statement" that listed Salmon as the "contractor" on the Project—for submission to the Bank in connection with the Loan, and then Krantz submitted those documents to the Bank. And according to Salmon's principal Chad Salmon, Krantz walked into Salmon's offices and asked the secretary there to submit an application for the Permit on Bergdorf's Project that listed Salmon as the general contractor on the Project, and the secretary complied, including paying the four-figure permit fee out of Salmon's funds. Moreover, in later communications, Krantz listed himself as "Randy Krantz, Project Manager, Salmon Electrical Contractors." In my view, there is no question that sufficient evidence exists, viewed in the light most favorable to Bergdorf, to satisfy the first *Burdick* factor.

¶49 Salmon's best argument lies with the second *Burdick* factor, which is where Bergdorf's knowledge of these events becomes relevant. *See id.*(describing the second factor as whether

"the third person knew of the facts and, acting in good faith, had reason to believe, and did actually believe, that the agent possessed such authority" (quotation simplified)). I acknowledge that this is the closest question presented, and that the evidence of Bergdorf's knowledge is thinner than the evidence of Salmon's assent to Krantz's agency or of Bergdorf's reliance. But even here, I think there is enough to support a finding by a reasonable jury that Bergdorf reasonably believed that Krantz was acting as Salmon's agent.

¶50 Certainly, there is evidence that Krantz told Bergdorf that he and Salmon were "partners" and that Salmon would be the general contractor for the Project. But the majority correctly notes that Bergdorf's reasonable belief needs to be based, at least in part, on some action of the principal; an agent's representations are not enough. *See supra* ¶ 20. However, a principal's action endorsing the act of the agent can occur even after the agent's act has taken place, if the principal acts to ratify the previous act of the agent. *See Bradshaw v. McBride*, 649 P.2d 74, 78 (Utah 1982). Ratification "need not be express," and "silence with full knowledge of the facts may manifest affirmance and thus operate as a ratification." *Id.* (quotation simplified). A principal may not "escape ratification" through being "wilfully ignorant, nor may he purposely shut his eyes to means of information within his possession and control." *Id.* (quotation simplified).

¶51 In this case, Salmon filled out the Loan application paperwork, and allowed Krantz to submit it to the Bank; that documentation listed Salmon as the general contractor on Bergdorf's Project. While there is no evidence that Bergdorf knew about the loan documentation when it was submitted, she certainly learned later—when the Bank sent a confirmation email, copied to both Bergdorf and Chad Salmon, notifying them that Salmon "has been accepted as the General Contractor" on the Project—that Salmon had submitted some form of

application to the Bank seeking to be treated as the contractor on her Project. After receiving this email, Salmon took no action to disabuse anyone, including Bergdorf, of the notion that it was the general contractor on the Project. A reasonable jury could conclude that this email—and Salmon's decision not to contradict it—confirmed, in Bergdorf's mind, all of the things Krantz had been telling her about his relationship with Salmon, and could infer from this evidence that Bergdorf reasonably believed, based in part on Salmon's actions, that Salmon had authorized Krantz to act as its agent.

¶52    The majority believes that, because the Loan never closed, the documents related to the Loan—including the email— somehow lose their relevance. I simply disagree. Whether the Loan ever closed does not necessarily have anything to do with whether Salmon agreed to act as the general contractor on the Project or with whether Salmon agreed to allow Krantz to act as its agent. Bergdorf correctly points out that a contract to build a structure, and the financing for that contract, are entirely different conceptually, and that "the fact that [Bergdorf's] construction loan was not approved means she needed to get funding elsewhere, not that she needed a new construction contract." I therefore disagree with the majority's contention that "a jury could reasonably infer only that Bergdorf believed Salmon had agreed to serve as the general contractor for the Project if the Loan closed." *See supra* ¶ 25. Contractors generally do not care where the money that pays them comes from, as long as they get paid. There is a reasonable inference to be drawn— certainly "more than pure speculation," *Heslop v. Bear River Mutual Ins. Co.*, 2017 UT 5, ¶ 21, 390 P.3d 314—that Salmon's agreement to act as the general contractor on Bergdorf's Project was not conditional on the Loan closing, but instead was only conditional on it getting paid from some source.

¶53    I acknowledge that some of Bergdorf's own deposition statements are harmful to her cause regarding the second *Burdick*

factor. As the majority notes, at one point during her deposition Bergdorf stated that she did not believe she had entered into any contractual relationship with Salmon. *See supra* ¶ 11. But at other points in Bergdorf's deposition, she testified that she believed that Salmon was the general contractor on the Project, and that Salmon and Krantz were "partners" on the Project. And she clarified that, while she believed that "all [her] relationships were with" Krantz, she does not understand the legal niceties of contractual relationships. Bergdorf's seemingly contradictory deposition testimony is admittedly confusing, and would require some explanation at trial, but in my view a reasonable jury could view that testimony as consistent with the notion that, while all of her person-to-person relationships were with Krantz, he was acting as Salmon's agent.

¶54    Moving now to the third *Burdick* factor, in my view there exists sufficient evidence that Bergdorf took action in reliance on her belief that Krantz was acting as Salmon's agent. *See Burdick*, 2015 UT 8, ¶ 23. Bergdorf submitted a Loan application to the Bank seeking financing for the Project on which Salmon was to be the general contractor. Bergdorf knew that Krantz did not have a valid contractor's license at the time, and Krantz told her that his "partner" Salmon was going to be acting as the general contractor on the Project. Bergdorf hired Krantz to perform work on the Project, and Krantz—with or without her knowledge— hired a demolition subcontractor who removed one of the building's interior walls, an act that Bergdorf alleges led to damages. Moreover, Bergdorf began the building process pursuant to the Permit listing Salmon as her general contractor, thereby believing that she had a licensed general contractor on her Project.[11]

---

11. Having a licensed general contractor on a project is important for several reasons, not the least of which is that licensed general

(continued…)

¶55 In short, I think there is enough evidence on all three of the *Burdick* factors to permit a reasonable jury to conclude that—at least during the 2012 part of the Project's timeframe—Krantz had apparent authority to act as Salmon's agent. And once that conclusion is drawn, it necessarily follows that a jury could also reasonably find in Bergdorf's favor on the question of whether a valid contract ever existed between her and Salmon. It is undisputed that Bergdorf asked Krantz to work on her Project, and that Krantz did so. To the extent that Krantz was taking those actions in the capacity as Salmon's agent, Salmon and Bergdorf had a contractual relationship.

¶56 As noted, merely because I believe that summary judgment was improvidently granted here does not mean that I believe that Bergdorf has a fantastic case against Salmon. In the end, the factfinder might find this evidence unpersuasive, or at least less persuasive than the evidence that unquestionably exists on the other side of the ledger. But that should be the jury's choice to make, and I cannot say that a determination in favor of Bergdorf on the contractual question would be unreasonable. For these reasons, I would reverse and remand for further proceedings.

———————

(…continued)
contractors are required to have liability insurance. *See* Utah Admin. Code R156-55a-302d.