HARRIS, Judge (dissenting):
 

 ¶45 I would not characterize Bergdorf's claim against Salmon as a strong one. Odds are, she would not prevail at a trial on the merits against Salmon if she were ever afforded one. But our task in reviewing this appeal is not to assess who has the better claim, or predict who is most likely to prevail at trial. Rather, our task is to determine if "a reasonable jury" could find in favor of Bergdorf on her claim against Salmon,
 
 see
 

 Helf v. Chevron U.S.A. Inc.
 
 ,
 
 2015 UT 81
 
 , ¶ 4,
 
 361 P.3d 63
 
 , and in making this determination, we must view the record evidence "in the light most favorable" to Bergdorf, the party who is resisting summary judgment,
 
 see
 

 Raab v. Utah Ry.
 
 ,
 
 2009 UT 61
 
 , ¶ 3,
 
 221 P.3d 219
 
 .
 

 ¶46 The majority correctly recites this standard,
 
 see supra
 
 note 1, but I disagree that it has appropriately applied it. In my view, the majority emphasizes the (ample) evidence supporting Salmon's position, while minimizing some of the (less copious) evidence supporting Bergdorf's position. Certainly, the question about whether "a reasonable jury" could possibly find in favor of a party on a specific claim is the type of inquiry upon which reasonable minds might reasonably differ, and on the record presented here I respectfully disagree with the majority's general conclusion that no reasonable jury could possibly find for Bergdorf.
 

 ¶47 Chiefly, I disagree with the majority's conclusion that no reasonable jury could find that Krantz had apparent authority to act as Salmon's agent. The majority correctly recites the elements of apparent authority: (1) that the principal has either "manifested" consent to the agent's exercise of authority or at least "knowingly permitted the agent" to exercise authority; (2) that the third person, based on actions of the principal, reasonably believed that the agent had apparent authority; and (3) that the third person has relied to her detriment on the appearance of authority.
 
 See
 

 Burdick v. Horner Townsend & Kent, Inc.
 
 ,
 
 2015 UT 8
 
 , ¶ 23,
 
 345 P.3d 531
 
 (quotation simplified). But I disagree with the majority's application of those elements to the facts of this case.
 

 ¶48 The first
 
 Burdick
 
 factor is satisfied simply by the principal's manifestation of consent to the agent's exercise of authority, or even by the principal's knowing decision to "permit[ ] the agent to assume the exercise of such authority."
 

 Id.
 

 (quotation simplified). And in this case there exists ample evidence to support a finding that Salmon took actions intended to clothe Krantz with authority to act as its agent on Bergdorf's Project. At trial, the jury would have learned, by way of background, that Salmon and Krantz had worked together on over a hundred construction projects, and that they were business partners in a commercial development project. Indeed, Krantz was familiar enough to Salmon's employees that he had the power to tell them to carry out tasks-like apply for and pay for the Permit-and they would follow Krantz's orders. On this particular Project, Salmon agreed-at Krantz's request-to act as the general contractor on Bergdorf's Project, and Salmon provided information to Krantz to assist him in drafting the written (but ultimately unsigned) Contract that listed Salmon as the contractor and Bergdorf as the client/owner. Salmon filled out a set of documents-including a W-9 form, a credit authorization, and a "builders statement" that listed Salmon as the "contractor" on the Project-for submission to the Bank in connection with the Loan, and then Krantz submitted those documents to the Bank. And according to Salmon's principal
 Chad Salmon, Krantz walked into Salmon's offices and asked the secretary there to submit an application for the Permit on Bergdorf's Project that listed Salmon as the general contractor on the Project, and the secretary complied, including paying the four-figure permit fee out of Salmon's funds. Moreover, in later communications, Krantz listed himself as "Randy Krantz, Project Manager, Salmon Electrical Contractors." In my view, there is no question that sufficient evidence exists, viewed in the light most favorable to Bergdorf, to satisfy the first
 
 Burdick
 
 factor.
 

 ¶49 Salmon's best argument lies with the second
 
 Burdick
 
 factor, which is where Bergdorf's knowledge of these events becomes relevant.
 
 See
 
 id.
 

 (describing the second factor as whether "the third person knew of the facts and, acting in good faith, had reason to believe, and did actually believe, that the agent possessed such authority" (quotation simplified)). I acknowledge that this is the closest question presented, and that the evidence of Bergdorf's knowledge is thinner than the evidence of Salmon's assent to Krantz's agency or of Bergdorf's reliance. But even here, I think there is enough to support a finding by a reasonable jury that Bergdorf reasonably believed that Krantz was acting as Salmon's agent.
 

 ¶50 Certainly, there is evidence that Krantz told Bergdorf that he and Salmon were "partners" and that Salmon would be the general contractor for the Project. But the majority correctly notes that Bergdorf's reasonable belief needs to be based, at least in part, on some action of the principal; an agent's representations are not enough.
 
 See
 

 supra
 
 ¶ 20. However, a principal's action endorsing the act of the agent can occur even after the agent's act has taken place, if the principal acts to ratify the previous act of the agent.
 
 See
 

 Bradshaw v. McBride
 
 ,
 
 649 P.2d 74
 
 , 78 (Utah 1982). Ratification "need not be express," and "silence with full knowledge of the facts may manifest affirmance and thus operate as a ratification."
 

 Id.
 

 (quotation simplified). A principal may not "escape ratification" through being "wilfully ignorant, nor may he purposely shut his eyes to means of information within his possession and control."
 

 Id.
 

 (quotation simplified).
 

 ¶51 In this case, Salmon filled out the Loan application paperwork, and allowed Krantz to submit it to the Bank; that documentation listed Salmon as the general contractor on Bergdorf's Project. While there is no evidence that Bergdorf knew about the loan documentation when it was submitted, she certainly learned later-when the Bank sent a confirmation email, copied to both Bergdorf and Chad Salmon, notifying them that Salmon "has been accepted as the General Contractor" on the Project-that Salmon had submitted some form of application to the Bank seeking to be treated as the contractor on her Project. After receiving this email, Salmon took no action to disabuse anyone, including Bergdorf, of the notion that it was the general contractor on the Project. A reasonable jury could conclude that this email-and Salmon's decision not to contradict it-confirmed, in Bergdorf's mind, all of the things Krantz had been telling her about his relationship with Salmon, and could infer from this evidence that Bergdorf reasonably believed, based in part on Salmon's actions, that Salmon had authorized Krantz to act as its agent.
 

 ¶52 The majority believes that, because the Loan never closed, the documents related to the Loan-including the email-somehow lose their relevance. I simply disagree. Whether the Loan ever closed does not necessarily have anything to do with whether Salmon agreed to act as the general contractor on the Project or with whether Salmon agreed to allow Krantz to act as its agent. Bergdorf correctly points out that a contract to build a structure, and the financing for that contract, are entirely different conceptually, and that "the fact that [Bergdorf's] construction loan was not approved means she needed to get funding elsewhere, not that she needed a new construction contract." I therefore disagree with the majority's contention that "a jury could reasonably infer only that Bergdorf believed Salmon had agreed to serve as the general contractor for the Project if the Loan closed."
 
 See
 

 supra
 
 ¶ 25. Contractors generally do not care where the money that pays them comes
 from, as long as they get paid. There is a reasonable inference to be drawn-certainly "more than pure speculation,"
 
 Heslop v. Bear River Mutual Ins. Co.
 
 ,
 
 2017 UT 5
 
 , ¶ 21,
 
 390 P.3d 314
 
 -that Salmon's agreement to act as the general contractor on Bergdorf's Project was not conditional on the Loan closing, but instead was only conditional on it getting paid from some source.
 

 ¶53 I acknowledge that some of Bergdorf's own deposition statements are harmful to her cause regarding the second
 
 Burdick
 
 factor. As the majority notes, at one point during her deposition Bergdorf stated that she did not believe she had entered into any contractual relationship with Salmon.
 
 See
 

 supra
 
 ¶ 11. But at other points in Bergdorf's deposition, she testified that she believed that Salmon was the general contractor on the Project, and that Salmon and Krantz were "partners" on the Project. And she clarified that, while she believed that "all [her] relationships were with" Krantz, she does not understand the legal niceties of contractual relationships. Bergdorf's seemingly contradictory deposition testimony is admittedly confusing, and would require some explanation at trial, but in my view a reasonable jury could view that testimony as consistent with the notion that, while all of her person-to-person relationships were with Krantz, he was acting as Salmon's agent.
 

 ¶54 Moving now to the third
 
 Burdick
 
 factor, in my view there exists sufficient evidence that Bergdorf took action in reliance on her belief that Krantz was acting as Salmon's agent.
 
 See
 

 Burdick
 
 ,
 
 2015 UT 8
 
 , ¶ 23,
 
 345 P.3d 531
 
 . Bergdorf submitted a Loan application to the Bank seeking financing for the Project on which Salmon was to be the general contractor. Bergdorf knew that Krantz did not have a valid contractor's license at the time, and Krantz told her that his "partner" Salmon was going to be acting as the general contractor on the Project. Bergdorf hired Krantz to perform work on the Project, and Krantz-with or without her knowledge-hired a demolition subcontractor who removed one of the building's interior walls, an act that Bergdorf alleges led to damages. Moreover, Bergdorf began the building process pursuant to the Permit listing Salmon as her general contractor, thereby believing that she had a licensed general contractor on her Project.
 
 [11]
 

 ¶55 In short, I think there is enough evidence on all three of the
 
 Burdick
 
 factors to permit a reasonable jury to conclude that-at least during the 2012 part of the Project's timeframe-Krantz had apparent authority to act as Salmon's agent. And once that conclusion is drawn, it necessarily follows that a jury could also reasonably find in Bergdorf's favor on the question of whether a valid contract ever existed between her and Salmon. It is undisputed that Bergdorf asked Krantz to work on her Project, and that Krantz did so. To the extent that Krantz was taking those actions in the capacity as Salmon's agent, Salmon and Bergdorf had a contractual relationship.
 

 ¶56 As noted, merely because I believe that summary judgment was improvidently granted here does not mean that I believe that Bergdorf has a fantastic case against Salmon. In the end, the factfinder might find this evidence unpersuasive, or at least less persuasive than the evidence that unquestionably exists on the other side of the ledger. But that should be the jury's choice to make, and I cannot say that a determination in favor of Bergdorf on the contractual question would be unreasonable. For these reasons, I would reverse and remand for further proceedings.
 

 Having a licensed general contractor on a project is important for several reasons, not the least of which is that licensed general contractors are required to have liability insurance.
 
 See
 
 Utah Admin. Code R156-55a-302d.